# EXHIBIT A
# PART 1 OF 3

# Report of James P. McGaughy, Jr.

# In

# Connecticut Yankee Atomic Power Company v. United States

## Fed. Cl. No. 04-0085T

On Behalf of the U.S. Department of Justice

**September 1, 2005**

GDS Associates, Inc.
Engineers and Consultants

# Report of James P. McGaughy, Jr.
# In
# Connecticut Yankee Atomic Power Company v. United States
# Fed. Cl. No. 04-0085 T

I, James P. McGaughy, Jr. have been asked by the U.S. Department of Justice to review documents filed in the above proceeding and to render an opinion concerning various issues.

## GDS Associates, Inc.

I am Vice President and Secretary and a founder of GDS Associates, Inc., a consulting engineering firm located in Marietta, GA as well as other locations. Our 100-person firm works primarily in the electric utility industry. Our areas of expertise include power supply planning (including power supply contract preparation); power transmission; power plant engineering, operation and construction; plant financing; distribution engineering; electric rate making; demand-side engineering and planning and other disciplines. A more extensive description of our services is attached as Exhibit 1.

## My background and qualification

I hold a BS degree in electrical engineer from MIT '64 and a MS degree in nuclear engineering from Stanford University '69. I served in U.S. Navy nuclear submarines for four years and completed the Navy Nuclear Power Training Program. I worked for Middle South Utilities (now Entergy) for 15 years in the power production field. I served as Vice President, Nuclear responsible for the Grand Gulf Nuclear Station. In 1986, six principals, including me, formed GDS Associates, where I serve as head of the GDS Generation Services Department. I have provided construction and operations monitoring services for minority owners for nuclear, gas and coal fired-plants. I have provided litigation services in several nuclear power plant litigations. I have testified in proceedings concerning dispatch, reliability, avoided cost and other issues concerning power plant projects. I have been involved in the development of several power plant purchase and related power supply agreements. My complete resume is attached as Exhibit 2.

## Prior Department of Justice Work

I worked in two cases involving nuclear fuel placed-in-service dates with the Department of Justice.

**Background on this Case**

As I understand it, Connecticut Yankee Atomic Power Company (CY) has requested an income tax refund for the years 1987 through 1990 for investments in capital additions and nuclear fuel claimed to have been placed in service during those years. Specifically, § 204(a)(3) of The Tax Reform Act of 1986 allows an investment tax credit for otherwise qualified property if that property "is readily identifiable with and necessary to carry out a written supply or service contract…which was binding" on December 31, 1985. CY has identified the capital improvements in approximately the same amounts listed in their FERC Form 1's[1] for capital additions for those years and the costs of nuclear fuel reload batches placed in service in 1987 and 1990. I was asked by the Department of Justice to review the power supply contract in place at the time (1985) and the many other documents supplied by CY and make the following determinations:

1. "For the specific property claimed by CY, you should determine whether each item (or group of related items) is readily ascertainable or easily determined from the [power] supply contract and related documents."
2. "In addition, you should determine whether the *amount* of the property claimed is readily ascertainable from the [power] supply contract and related documents."
3. "Finally, you should determine whether the property was necessary to carry out the terms of the contract."

I am being compensated for my time at the rate $232/hr.

**Documents Reviewed**

1. Letter from CY, Kathleen Jewell-Kelleher, Treasurer, to IRS dated June 26, 2000.
2. CY FERC Form 1's for years 1987-1991.
3. Documents supplied in discovery by CY stamped with Bates Stamp 00001 to 17,898.
4. Plaintiff's Response to Defendant's First Set of Interrogatories dated January 2005.
5. Plaintiff's Response to Defendant's Second Set of Interrogatories dated March 28, 2005.
6. Transcript of Deposition of Thomas J. Dente, May 4 2005
7. Transcript of Deposition of Louis Balducci, May 5, 2005
8. Connecticut Yankee's Statement of Position (II) dated August 2, 2005 and attachments.

[1] Utilities are required by the Federal Power Act to file annual financial and operating data with the Federal Energy Regulatory Commission (FERC). These reports are filed on a standard format called "FERC Form No. 1"

**Review of Capital Additions**

CY has supplied a list of capital addition projects that are included in the claim. I have attached this list as Exhibit 3. I have reviewed all the documents supplied by CY and I have reviewed the responses to the DOJ's interrogatories. In these documents there are Work Orders that contain project costs and brief project descriptions for some, but not all of the projects. Attached to Exhibit 3 are the cover sheets for the work orders and the descriptions contained in the Work Orders. There are voluminous tables of accounting data attached to the coversheets, which I have not included. There were budgets that forecast the need and costs for some of the projects. There were NRC bulletins and notices, inspection reports and other documents that led to the necessity for some of the projects. The projects listed for each year total to the approximate amount included on line 23, page 204 of the pertinent FERC Form 1's.

To illustrate how CY has presented these projects I will look at material made available on project # 22400101-1989-$24,194,787 (See Exhibit 4). This is the single largest project and probably has the most information about it. Information backup (See Exhibit 5) on this project consists of:

1. Section of federal regulations dealing with fire protection in nuclear plants
2. Inspection report that indicates that CY had committed to project to NRC
3. Copy of CY budget that may show that project was in budget
4. Work order summary indicating that money was spent (numbers do not match Exhibit 3 as the money may have been spent in more than one year.)

One of these CY supplied documents is a federal regulation applicable to all nuclear power plants and one is a federal authored inspection report. The other two are part of the routine budget and accounting process of CY. Note that what was actually spent was more than twice what had been budgeted in 1985.

The other projects have similar or less information. The Work Order documentation of project costs was missing for $49,625,210 out of $119,061,243 in capital additions claimed by CY. See Exhibit 5.

The question then becomes how these documents relate to the power supply contract and related documents. The original power supply contract is dated July 1, 1964. While it was amended a number terms over the years, the basic terms remain essentially the same. My instructions also asked me to review the contract and "related documents". In our work at GDS, such "related documents" would consist of interchange agreements; transmission service agreements, interchange agreements and others. These agreements I have listed generally do the following things:

- <u>Interchange Agreement</u> – An agreement between two or more electric systems where the parties agree to provide one another with mutual support services to allow each party to operate its system more economically and reliably than without such mutual support. The mutual support services typically include (1)

replacement energy for maintenance outages, (2) emergency services, (3) economy energy, (4) diversity energy exchanges, and (5) other short-term capacity and energy transactions.

- Transmission Service Agreement – An agreement between the owner/operator of a transmission system (transmission provider) and a user of the transmission system (transmission customer) that provides the transmission customer with access to transmission for the movement of power from power resources to load centers. Such transmission service agreements are normally entered into pursuant to an open access transmission tariff approved by the Federal Energy Regulatory Commission.

- Scheduling Agreement – An agreement that provides for scheduling the transmittal, receipt, and delivery of electric power and energy in accordance with the communications and operating protocols of the applicable control areas, transmission providers, and plant operators.

None of these types of agreements were produced.

It is interesting to note that the late '80's were turbulent times at the CY plant with long outages and significant expenditures. Confidential document CY 05546 (Exhibit 6) shows that projected future work (1985-1990) changed by $45,576,000 between what was approved in 1985 and what was approved one year later in 1986. It seems clear that the work required in '87 through '90 was not readily ascertainable on December 31, 1985 from the power supply contract or *from any other 1985 documents, related or non-related.*

## Conclusions on Capital Additions

My conclusions or determinations concerning the capital addition projects are as follows:

1. "For the specific property claimed by CY, you should determine whether each item (or group of related items) is readily ascertainable or easily determined from the [power] supply contract and related documents." *There is no mention of capital additions in the power supply contract. There is a requirement for operating in accordance with federal law and the NRC operating license and to operate in accordance with "prudent utility practice" and perhaps these projects fall into that category. However there is no project that is "readily ascertainable or easily determined from the power supply contract and related documents."*
2. "In addition, you should determine whether the *amount* of the property claimed is readily ascertainable from the [power] supply contract and related documents." *There is nothing in the power supply contracts or related documents that make the amount of the property claimed ascertainable.*

3. "Finally, you should determine whether the property was necessary to carry out the terms of the contract". *The property was probably necessary to operate the plant.*

## Nuclear Fuel

A nuclear power plant such as CY generates heat from a uranium core. Periodically, one third of the core will be removed and replaced with fresh fuel. At CY this was normally done on an 18-month cycle. In this case, CY claims $43,279,848.80 for a reload placed in service in 1988 and $45,390,217.39 for a reload placed in service in 1990.

In today's world, these cycles are very predictable and nuclear plants startup and shutdown on schedule and generate large amounts of predictable energy based on long term, well-planned schedules. Such was not the case in the late '80's at CY and at numerous other plants. Many plants, including CY had long outages resulting from many plant improvements required by the NRC to correct deficiencies revealed by investigations as a result the accident at Three Mile Island in 1979. CY had plans for three reloads during the '86 through '90 period but CY was only able to place the two reloads claimed above in service during this time period (See CY 07229). From the documents provided and Mr. Dente's deposition, there were contracts in place in 1985 for these reloads, but the ultimate quantities were not ascertainable because of lengthy outages and because significant portions of the 1990 reload had to be replaced because of a refueling accident that damaged some fuel. Also, in the 1987 reload, adjustments were made in uranium content and fabricating materials for Zircalloy test fuel to be inserted. Exhibit 6 shows what generation was planned in 1985 and what actually happened in the years in question (1987-1991).

The power supply contract makes little mention of fuel at all. Nothing in the power supply contract states how the CY plant will be operated (base load—all the time, intermediate load—some, but not all the time, or as a peaker—only when absolutely necessary). It is my experience that power supply contracts would define who controls how the plant would operate and what controls the customer would have in setting the amounts and time of delivery of power. Nothing in this power supply contract would allow determining what kind of fuel, how much fuel or when it should be purchased.

**Conclusions on Nuclear Fuel**

I now go to the questions asked by the DOJ:

1 "For the specific property claimed by CY, you should determine whether each item (or group of related items) is readily ascertainable or easily determined from the [power] supply contract and related documents." *The power supply contract and related documents do not deal with any specifics concerning nuclear fuel. The actual amount and timing of delivery of nuclear fuel to be used were not known in 1985.*

2 "In addition, you should determine whether the *amount* of the property claimed is readily ascertainable from the [power] supply contract and related documents." *No quantities of fuel are mentioned in the power supply contract. The expected operating mode of the plant (base load, intermediate, peaker etc.) is not in or required by the power supply contract. Procurement of nuclear fuel is not discussed.*

3 "Finally, you should determine whether the property was necessary to carry out the terms of the contract". *Nuclear fuel is certainly necessary to operate the plant and thus supply power.*

# EXHIBIT 1

GDS is a multi-service engineering and management consulting firm, headquartered in Marietta Georgia, with offices in Auburn, Alabama; Austin, Texas; Manchester, New Hampshire; Madison, Wisconsin; and Manchester Maine. Since its inception in 1986, GDS has enjoyed considerable growth and now employs a staff of over 100. Over the past 18 years, GDS has dependably served its clients and provided a stable work environment for its employees. (Additional information regarding GDS' financial statements is available upon request). The firm promotes diversity in the workplace and complies with all applicable EEO laws and regulations, as well as all applicable corporate filing requirements and State tax laws.

GDS has a broad array of management, strategic, and programmatic consulting expertise and specializes in energy, telecommunications, water and utility planning issues. GDS has considerable experience with deregulation and competitive issues in the energy industry, and also provides Information Technology, Market Research, Statistical and Management Consulting Services to a diverse client base.

The GDS consulting staff has extensive engineering, project management, and consulting experience. GDS senior consultants are recognized leaders in their fields, dedicated to their clients, and innovative in their approach to delivering quality consulting services that satisfy client needs.

Among the many consulting areas in which GDS has specialized skills are:

| | |
|---|---|
| **Renewable Energy, Resources, Distributed Generation, and Combined Heat and Power Services** | GDS provides expertise in addressing the complex economic, engineering, scientific and governmental issues associated with renewable and other distributed generation resources that impact utilities, government agencies, developers, and their customers. |
| **Energy Efficiency and Demand Side Management Services** | Our staff of highly qualified program design and analysis specialists assists clients with the complexities of multi-faceted energy efficiency planning, program implementation and evaluation. |
| **Statistics and Market Research Services** | GDS supplies wide-ranging statistical and market research services to a diverse client base. Our services stretch from proven survey design that captures demographic profiles of consumers and potential customers, to data mining and analysis of utility load information. |
| **Environmental Management Services** (GreenLine Environmental) | GreenLine Environmental, a division of Hi-Line Engineering, LLC, provides environmental services to utilities, municipals, developers, industry, and the military. These services include right-of-way vegetation management, GPS and GIS mapping and inventory, environmental assessments, and urban forestry consulting. |
| **Information Technology Services** | A complete understanding of client business problems and needs is critical to the implementation of successful IT systems. GDS specializes in understanding these issues and combines this knowledge with select technologies to create cost-effective IT solutions. |
| **Power Supply Planning Services** | Securing adequate and reliable power resources is crucial to thriving in a more competitive electrical market. GDS has helped guide its clients through uncharted territory by providing power supply portfolio, resource planning, forecasting, financial and competitive analysis services. |
| **Generation Services** | Greater competition has made effective control of power generation costs increasingly important. Over a span of more than 15 years, GDS has helped numerous power plant co-owners and non-utility generators reduce costs and achieve improved performance by identifying inefficiencies in |

| | |
|---|---|
| | power plant construction, operation and maintenance practices, and providing practical solutions. |
| **Regulatory and Restructuring Services** | GDS provides comprehensive regulatory and restructuring services to generators, transmitters, distributors, and large users of energy. Numerous state and federal restructuring initiatives have made regulatory planning and strategy development essential. To assist our clients with this task, GDS brings decades of expert regulatory experience in key areas such as rate design and litigation, contract negotiation, and transmission access. |
| **Deregulation and Retail Energy Procurement Services** | GDS provides a wide range of services to help clients plan for and benefit from participation in deregulated energy markets. These include: retail aggregation and energy procurement, merchant plant services, stranded cost analysis, and electric restructuring policy analysis. |
| **Utility Privatization Services** | GDS has successfully assisted clients throughout the country in their efforts to acquire the utility electric, gas, and water distribution systems. |
| **Financial Analysis and Rate Services** | The recent pace of regulatory change and uncertainty is unrivaled in the utility industry and requires equally unparalleled flexibility in ratemaking and regulatory strategies. GDS has been at the forefront of industry restructuring policy, offering broad expertise in regulatory accounting, economics, finance, and ratemaking. |
| **Electric Planning and Design Services** (Hi- Line Engineering, LLC) | Hi-Line Engineering, LLC, a GDS company, offers planning, mapping, and design services to the electric utility industry throughout the United States. We provide high-quality, personal service to rural electric cooperatives, investor-owned utilities, municipals, and the U.S. military. |
| **Water and Wastewater Utility Consulting Services** | GDS provides expert assistance to water and wastewater utility management and users of water resources by addressing the complex engineering, accounting, economic, management, operational, regulatory, and policy issues that impact the water industry. GDS serves a variety of clients including municipalities, investor-owned utilities, water districts, non-profit customer-owned systems, and government agencies. |
| **Natural Gas Consulting Services** | GDS provides creative solutions to help our clients meet challenges arising in both regulated and competitive environments within the evolving natural gas utility industry. Our team of highly qualified professionals works to address complex economic, engineering, accounting, policy, and regulatory issues with clients including consumer groups, publicly owned utilities, regulatory authorities, the military and government agencies. |

# EXHIBIT 2

**James P. McGaughy, Jr.**
Vice President and Secretary

**EDUCATION:** M.S., Mechanical Engineering, Stanford University, 1969
U.S. Navy Nuclear Power Training Program, 1964-65
B.S., Electrical Engineering, MIT, 1964

**ENGINEERING REGISTRATION:** Registered Professional Engineer

**PROFESSIONAL MEMBERSHIP:** American Nuclear Society
Institute of Electrical and Electronic Engineers

**EXPERIENCE:**

Mr. McGaughy directs the power generation services function at GDS Associates, Inc. He has 39 years experience in the power generation field in the areas of licensing, design, construction, start-up, operation, and maintenance of nuclear and fossil-fired power plants. Mr. McGaughy has worked with top utility management to solve problems on a wide range of power generation issues. He has successfully managed extremely large and complex generation projects, both nuclear and fossil, which required the rigorous maintenance of project schedules and quality. He has performed studies concerning cogeneration projects involving unit dispatch and FERC operating and efficiency standards. Mr. McGaughy has provided testimony before the Texas Public Utility Commission, Public Utility Commission of Ohio, South Carolina Public Service Commission, Georgia Public Service Commission, Hawaii Public Utility Commission, New Jersey Board of Regulatory Commissioners, Michigan Public Utility Commission, Wisconsin Public Service Commission and FERC. He has performed work concerning over 30 nuclear units and 24 fossil-fired steam units as well as numerous combustion turbine and combined cycle units.

**Specific Experience Includes:**

1986-Present **GDS Associates, Inc.**

As Vice President and Secretary, Mr. McGaughy serves as head of the Generation Services Department of GDS. GDS has provided construction and operations monitoring program at five nuclear units and six coal-fired units for minority owners. GDS has provided expert witness and litigation support in lawsuits involving six nuclear units. Mr. McGaughy also has been responsible for prudence, construction monitoring and litigation support efforts at numerous other nuclear units and for development of a nuclear performance standard program for the Georgia Public Service Commission. He has testified on combustion turbine construction projects in certification proceedings and has testified on dispatch, reliability, avoided cost and other issues concerning cogeneration projects.

1984-1986 **Southern Engineering Company**

As Director of Generation Services, Mr. McGaughy conducted construction and operations monitoring for clients at power plants throughout the United States. In addition, Mr. McGaughy prepared testimony for various rate cases on generation matters at FERC and state commissions. He provided assistance to clients in all generation matters including contract administration and litigation support.

1980-1984 **Mississippi Power and Light Company**

Mr. McGaughy served as Vice President, Nuclear (1983-84) and Assistant Vice President, Nuclear Production (1980-82). He was responsible for all aspects of construction and operation of a multi-billion dollar power generation facility. In this capacity he hired and trained the nuclear power plant staff of over 500 people, including 29 licensed operators and numerous experienced utility managers. Mr. McGaughy also established a unique design engineering group which grew to over 125 people and had overall responsibility for interface with the Nuclear Regulatory Commission and all contractors on the project. During this tenure, cost and schedule performance was better than at any other similar plant (G.E. Boiling Water Reactor, BWR-6 design).

1973-1980 **Mississippi Power and Light Company**

Mr. McGaughy served as Director of Power Production (1978-80). In this capacity he was responsible for all power production related activities including construction, operation, engineering, maintenance, licensing, nuclear safety, staffing, and training. He prepared and administered annual personnel and operating budgets for 600 people and more than $50 million, and an annual capital budget of $280 million. He also established a formal screening program for hiring craft personnel, established a formal preventive maintenance program, and reorganized his department based on job performance. He served as project manager for 2-unit, 1,600 MW coal project.

**Mississippi Power and Light Company**

Mr. McGaughy served as Nuclear Project Manager (1976-78) and Assistant Project Manager (1973-75). He was responsible for forming and managing an organization to control the prime contractor on a $4 billion construction project. He began the formation of plant staff organization. He was also responsible for relations with the Nuclear Regulatory Commission and the prime contractor (Bechtel). The construction permit was awarded in record time.

1971-1973 **Middle South Services, Inc.**

Mr. McGaughy served as a nuclear engineer on the holding company staff responsible for economic and engineering studies including the feasibility evaluation for Grand Gulf

Nuclear Station. He performed nuclear fuel and uranium buying functions. He also performed generation-mix studies.

1969 - 1971 **Arkansas Power and Light Company**

Mr. McGaughy was responsible for nuclear fuel procurement and performed the licensing work including the preparation of the Safety Analysis Report for Arkansas Nuclear One, Unit 2.

**SIGNIFICANT CONSULTING ASSIGNMENTS:**

North Carolina Electric Membership Cooperative – Performed due diligence review of management for a 3-site, 1,200 MW, peaking project. Reviewed management site selection, fuel, equipment selection, environmental, contracting and other aspects.

VECO Alaska, Inc. – Served as construction project management expert witness for EPC contractor in lawsuit concerning construction overruns in a turnkey cogeneration project in Alaska. Served as witness in successful mediation.

H.C. Price Construction Company – Provided detailed analysis and mediation presentations concerning construction project management in case involving construction contractor and owner (State of Alaska) of a coal-fired plant in Alaska.

Rusk County, Texas Rural Electric Cooperative/Richard Balough – Testified before the Texas Public Utility Commission concerning coal-fired plant station electric service in territorial dispute with Texas Utilities.

Sam Rayburn G&T – Ongoing operational monitoring program concerning client's interest in Nelson 6 Coal Station operated by Gulf States Utilities.

Kamo Electric Cooperative – Operational monitoring program for client's minority interest in GRDA Unit 2 Coal Fired Station.

Northeast Texas Electric Cooperative – Ongoing construction monitoring and operational monitoring program concerning NTEC's interest in Pirkey Coal Station operated by Southwestern Electric Power Company and Dolet Hills Station operated by Central Louisiana Electric Company.

Sawnee and Coweta/Fayette Electric Membership Cooperatives – Served as Owner's project monitor on Sewell Creek Combustion Turbine Plant, Doyle Combustion Turbine Project, Chattahoochee Combined Cycle Project and Talbot County Combustion Turbine Project.

Northeast Texas Electric Cooperative – Served as Owner's representative on Project Management Committee for design, construction and operation of 500Mw combined cycle plant.

U.S. Department of Justice – Served as expert witness in two tax cases involving investment tax credits for nuclear fuel.

Pacific Gas & Electric Company – Performed technical analyses of two different cogeneration plants to determine if projects had met FERC and state efficiency and operating standards.

Steel Dynamics, Inc. – Analysis of imprudence and replacement power costs at D.C. Cook Plant.

Corn Belt Power Cooperative – Performed review of available options for board of directors with recommendations for future plan of action.

Niagara Mohawk Power Corporation/Swidler & Berlin – Prepared extensive technical analysis for filing in federal court and at FERC concerning efficiency and operating standards of cogeneration facility in support of motion to revoke QF certification.

Niagara Mohawk Power Corporation/Swidler & Berlin – Assisting in FERC proceeding to set new rates for disqualified former QF.

East Texas Electric Cooperative – Assisted cooperative in negotiating steam and electric service contract with industrial customer.

Georgia Public Service Commission Staff – Testified before the Georgia Public Service Commission recommending that a nuclear performance standard be implemented in the State of Georgia. The Commission implemented the recommended standard.

City of El Paso – Testified before the Public Utility Commission of Texas regarding Palo Verde operations and maintenance expenses.

City of El Paso – Testified before the Public Utility Commission of Texas regarding valuation of Palo Verde power plant and other merger issues.

City of Homestead, Florida/Spiegel & McDiarmid – Assisted City in lawsuit regarding DeLaval Diesel-Generators. Prepared expert testimony and gave major deposition on subject before favorable settlement.

El Paso Community College/Law offices of Jim Boyle – Prepared testimony concerning level of Palo Verde Nuclear Station operation and maintenance costs requested by El Paso Electric. Analysis was performed on bases of comparative studies and on specific analysis of cost filed by El Paso Electric.

Old Dominion Electric Cooperative – Prepared testimony filed at FERC concerning prudent levels of coal inventory for inclusion Virginia Power working capital.

Long Island Lighting Company/Shea & Gould – Prepared expert testimony on nuclear plant construction.

Ohio Public Service Commission – Prepared testimony related to decommissioning costs of Toledo Edison's Davis-Besse Nuclear Station.

Georgia Public Service Commission/Hicks, Maloof & Campbell – Assisted Georgia Public Service Commission staff and attorneys in many aspects of Georgia Power Company's 1989 rate case including analysis of service company charges, construction prudence of Vogtle Unit 2, decommissioning costs of Vogtle and Hatch nuclear units, prepared expert testimony on operation and maintenance costs for Hatch and Vogtle nuclear units, prepared expert testimony on Performance Incentive Plan for Georgia Power nuclear units.

Georgia Public Service Commission/Hicks, Maloof & Campbell – Prepared testimony related to Vogtle and Hatch plant operations and maintenance costs in 1991 Georgia Power rate case.

Georgia Public Service Commission Staff – Prepared testimony concerning certification of McIntosh Units, Warner Robins Units, Intercession City Unit and Florida Power Corporation Power Purchase (three separate dockets)

City of Houston – Testified before Texas Public Utility Commission regarding South Texas Project operation and maintenance expenses.

Sam Rayburn G&T – Prepared testimony before Texas Public Utility Commission concerning certificate of convenience and necessity for co-op purchase of 38 mw interest in an existing coal-fired plant.

Aetna Insurance Company/Dickson, Carlson & Campillo – Assisted attorneys in analysis of Southern California Edison claims of property damage and replacement power costs. Prepared written analyses used in achieving favorable settlements for clients.

East Texas Electric Cooperative – Performed economic and technical feasibility analyses on hydro and thermal generation alternatives.

Allegheny Electric Power Cooperative – Assisted co-op in review of various financial and technical issues of Susquehanna Nuclear Station.

Saluda River Electric Cooperative – Assisted co-op in review of technical issues including decommissioning and minimum net dependable capability ratings for the co-op's minority interest in Catawba Nuclear Station operated by Duke Power Company.

City of Midland, Michigan – Assisted city in tax assessment case concerning Midland Nuclear Plant with Consumer's Power Company.

City of Wallingford, Connecticut – Reviewed decommissioning costs of Millstone Nuclear Units 1, 2, and 3 in CP&L rate case at FERC.

Nucor Steel/Ritts, Brickfield & Kaufman – Prepared testimony concerning prudence of construction of Carolina Power & Light Company's Sheron Harris Station.

City of Austin, Texas – Review of cost and schedule of South Texas Nuclear Plant.

Sam Rayburn Municipal Power Authority – Performed operational monitoring program relative to the client's minority interest in Nelson 6 Coal Station operated by Gulf States Utilities.

Tex-La Electric Cooperative/Brazos Electric Cooperative – Conducted construction and operational monitoring program for minority owners of Comanche Peak Nuclear Station.

Tex-La Electric Cooperative/Brazos Electric Cooperative/Texas Municipal Power Authority (Attorneys - Burchette & Associates, Spiegel & McDiarmid, and Fulbright & Jaworski) – Assisted attorneys as consulting experts and litigation managers in all aspects of the lawsuit brought by Texas Utilities against the minority owners of Comanche Peak Nuclear Station.

Attorney General, State of Michigan – Prepared analysis and testimony concerning power plant availability and system dispatch in Consumer Power fuel plan case.

Attorney General, State of Michigan – Prepared analysis and testimony concerning purchased power costs in Consumer Power fuel reconciliation case.

Attorney General, State of Michigan – Prepared analysis and testimony concerning avoided costs, PURPA rates, reserve margins, plant availability and dispatchability in MCV settlement case
U-10127.

Attorney General, State of Michigan – Analysis and testimony concerning Consumers' application of requirements of order in Case No. U-10127.

New Jersey Rate Counsel – Review of Public Service Electric & Gas Company nuclear and fossil O&M costs and capital additions in PSE&G general rate case.