# EXHIBIT B
# PART 1 OF 3

IN THE MATTER OF

# Connecticut Yankee Atomic Power Co.
# vs
# The United States

Transcript of Deposition of

## James P. McGaughy, Jr.

Volume 1

Taken by Steven A. Kaufman, Ph.D., Attorney at Law

On **September 9, 2005**

*Reported by* Martha L. Hufstetler
*Certified Court Reporter*

DONOVAN REPORTING, P.C.
*Certified Court Reporters*

UNITED STATES COURT OF FEDERAL CLAIMS

CONNECTICUT YANKEE ATOMIC
POWER COMPANY,
Plaintiff,
vs. Fed. CI. NO. 04-0085 T
Judge Francis M. Allegra

THE UNITED STATES,
Defendant.

- - -

Deposition of JAMES P. McGAUGHY, JR.,
Taken by the Plaintiff,
Before Martha L. Hufstetler,
Certified Court Reporter and Notary Public,

At the Law Offices of
Holland & Knight
Atlanta, Georgia

On September 9, 2005, at 9:03 a.m.

- - -

APPEARANCES OF COUNSEL

For the Plaintiff:

STEVEN A. KAUFMAN, Ph.D.
LEVINA WONG
Ropes & Gray
One International Place
Boston, MA 02110-2624
617.951.7000
FAX 617.951.7050

For the Defendant:

G. ROBSON STEWART
U.S. Department of Justice
PO Box 26
Washington, D.C. 20044
202.307.6493
FAX 202.514.9440

\- - -

INDEX TO PROCEEDINGS


| PLAINTIFF'S EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Report of James P. McGaughy, Jr. | 3 |
| Exhibit 2 | Connecticut Yankee's Statement of Position (II) | 15 |
| Exhibit 3 | Power Contract | 40 |
| Exhibit 4 | Inspection No. 50-213/89-13 | 73 |
| Exhibit 5 | Expert Report of Thomas J. Dente on Behalf of Connecticut Yankee | 77 |


(REPORTER'S NOTE: The exhibits described above were retained by counsel per agreement and are, therefore, not available for inclusion in this transcript. The descriptions listed are taken from the transcript text and not from the reporter's view of the exhibits.)

September 9, 2005
9:03 a.m.
(Whereupon the reporter provided a written disclosure to all counsel pursuant to OCGA 9-11-28.)

MR. KAUFMAN: Swear the witness, please.

JAMES P. McGAUGHY, JR., P.E.,
being first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. KAUFMAN:

Q Mr. McGaughy, would you please spell your name for the record.
A My name is James, J-A-M-E-S, Porter, P-O-R-T-E-R, McGaughy, M-C-G-A-U-G-H-Y, Jr.

MR. KAUFMAN: Would you mark this, please, as McGaughy Exhibit 1.

(Whereupon a document was identified as Plaintiff's Exhibit No. 1.)

Q Mr. McGaughy, I'll show you what's been marked as McGaughy Exhibit 1. Would you identify that for the record, please?
A Yes. This is a copy of a report

that I did for the U.S. Department of Justice.

Q In this case?

A In this case.

Q If you'd turn to the page numbered one.

A May I use my own?

Q Yes, that's fine if you do. At the bottom you say that you worked in two cases involving nuclear fuel placed in service dates with the Department of Justice. Do you see that?

A I do.

Q Which were those cases?

A One was Connecticut Yankee involving --

Q You said Connecticut Yankee?

A I did.

Q Okay.

A Involving the reload before the one in here. In fact, it was the one that Mr. Dente talked about yesterday -- or Balducci talked about yesterday, and the other one was a similar case with Northern States Power. And that was -- well, the fuel involved was '85, '86. At the time of the case, it was mid '90s,

I think.

Q That's for the Northern States case?

A Both of them.

Q Both of them. What do you mean by nuclear fuel placed in service dates?

A Well, I guess I can explain the whole thing without getting too -- as I understand, the law dealing with investment tax credits changed at the end of '85. And so they had fuel for this reload that was delivered in '85, but it was not put in the reactor until '86. And so the question is whether it would qualify for investment tax credit, which makes me wonder about this case, whether that's the same law or not.

But anyway, so their fuel was delivered, and they were claiming that it was placed in service when it was delivered to the site. And I maintained, it seemed to me in fact to Mr. Dente yesterday, too, that the fuel was placed in service when it was placed in the reactor, which was in '86, which according to what we were talking about at that time, then it wouldn't qualify according to the service

that it would qualify for credit.
Q And that position that you just described was one you took with respect to both of those two cases you mentioned?
A That's correct.
Q Would you describe the current case as a nuclear fuel placed in service date case as well?
A No. I mean in some ways it might be. If all of that fuel was placed in service in '85, it wouldn't be the case.
Q But that's not what you were asked to --
A That's not what we're talking about here.
Q Okay. Apart from those two cases in which you worked with the Department of Justice, were there other cases in which you worked with the Department of Justice?
A No. I was scheduled to work in the case, and it settled, and so no.
Q Have you ever worked in a case in opposition to the Department of Justice?
A No.
Q If you would please describe for me

the circumstances under which you came to be engaged by the Department of Justice in this case.

A Well, Mr. Stewart was the attorney in this other case ten years ago, and so when this came up, he called me.

Q And when was that?

A Oh, gosh. A year ago.

Q What state was the case in then, as you understood it?

A Well, I guess you'd say it was in the discovery phase.

Q What did Mr. Stewart ask you to do when he engaged you a year ago?

A A year ago. He explained the case, and asked me to review documents and some prior cases, and to become familiar with the procedure in the case, with the facts really.

Q So the first step that he asked you to take was to become familiar with the facts in the case and the general area of the law; is that accurate?

A Yes.

Q And the cases he asked you to look at were legal cases?

A Yes.
Q Now in your report, you list documents that you reviewed. Do you recall that? I think it was on the page numbered two of your report.
A Yes.
Q You don't list any legal cases, do you?
A No, I don't.
Q But you did review legal cases?
A I did a year ago. I mean it's not really part of this report.
Q Did it inform your thinking about the issues that you report on in your report?
A I don't think so.
Q No? Okay. What else did you review that you didn't list here?
A Well, I reviewed Mr. Dente's report and Mr. Balducci's report. I have seen a report -- I mean a Florida Power & Light case that came out, and I -- I wouldn't say I've reviewed it, but I've looked through it.
Q It's a very long document?
A It's very long.
Q Now those three documents that

you've just mentioned were all made public after the date of your report I believe; is that correct?

A That's correct. Well, two were simultaneous, I guess.

Q But you received them after you had written your report?

A Oh, yes.

Q But now which law cases did you review, do you remember?

A There was a Maine Yankee case, and there was something that dealt with telecommunication stuff, and I don't remember what the name of the case was, because it's not my field. I don't remember, I guess.

Q And did Mr. Stewart ask you to do anything initially other than to review those materials?

A Well, let's see. I helped prepare some discovery.

Q Which discovery did you help prepare?

A Well, let's see. It wasn't the initial -- I think he did some by himself first, and I think it probably was issued in

January I believe, somewhere in that time frame.

Q These were discovery requests of Connecticut Yankee?

A And interrogatories.

Q Propounded to Connecticut Yankee?

A Yes.

Q And in the course of preparing the discovery with Mr. Stewart, did you discuss with him the issues in the case?

A Yes, I'm sure we did.

Q And did he tell you the government's position on those issues in the case?

A I'm sure he did.

Q Did he ask for your assessment of the government's position in the case?

A I gave him my opinion, so I guess he asked for it.

Q And when did you give him your opinion first?

A Well, I guess I really didn't have an opinion until I got ready to write the report, because I hadn't seen any discovery.

Q I'm sorry. Please, go ahead.

A Because I hadn't seen the discovery. But, you know, we talked about how plants operate and how they do outages and power supply contracts. I guess I gave -- I gave an opinion that, you know, I can read the power supply contract, and I couldn't really see where any of these things were tied specifically to the power supply contract.

Q When did you first say that?

A Well, probably the fall of last year after I had read the contracts.

Q And how much else had you read by then?

A Well, I'd have to go look and see when I got these boxes of things, but I read them shortly after I got them.

Q Had you read, by the time you expressed that point of view, all that you've ever read in the case?

A Oh, no. No.

Q Let's just go through the eight items you list in your report.

A Could I make some corrections?

Q Corrections to your report?

A Yes.

Q At some point certainly, but can we continue with this?

A Sure.

Q That's fine. I mean I would like to have your -- what you think is your correct view, and if I forget to solicit it before --

A These are just typos.

Q Then please remind me.

Had you reviewed the letter from Connecticut Yankee to the IRS at the point at which you first expressed the view that you've just described?

A Had I already read that?

Q Yes.

A Yes, I had read that.

Q And how about the FERC Form 1 for the years '87 through '91, had you read them?

A Yes, I think so.

Q Had you read the documents produced in discovery by Connecticut Yankee Bates numbered one through 17,898?

A Well, I would say some, but not others.

Q Can you estimate the proportion of them that you had read at that point?

A Maybe half perhaps.
Q Had you read the plaintiff's response to the defendant's first set of interrogatories by the time you first expressed your point of view?
A Well, let me -- what are you calling my point of view? The conclusions reached here?
Q The record will show what you've already testified to having expressed to Mr. Stewart. That's what I'm talking about. The view that you can't see the items for which the investment -- I don't mean to characterize, but you've asked me to characterize.
A I could see no direct connection with the contract and these items. I could not see that by what I had seen. Yes.
Q And by "these items", you mean the items for which Connecticut Yankee was claiming the investment tax credit?
A That's correct.
Q Had you read the plaintiff's response to the defendant's first set of interrogatories dated January of 2005 at the point at which you expressed that point of

view? You said it was the fall of last year, which is before that.

A Yes.

Q And in the fall of last year is before March of this year?

A That's right. So why are you asking me that?

Q I'm not asking. I'm now just seeing that, so I'm not asking it.

So you hadn't looked at the transcript of Dente's deposition either, which came later?

A That's correct.

Q Or the transcript of Balducci's deposition, which came later?

A Right.

Q Or the statement of position two, which came later?

A That's correct.

Q Now you don't list Connecticut Yankee's statement of position one as an item you've reviewed. Is that because you didn't review it?

A Well, this letter is a statement of position, item number one. I don't know if it

was called that. But it was a letter that laid out a sketchy case. Is that what you're talking about?

Q It isn't. There's something that -- item number eight, which you've described as Connecticut Yankee's statement of position two --

A Yes.

Q -- has the caption of the case on it, and I'll show it to you now.

MR. KAUFMAN: We might as well mark it, please.

(Whereupon a document was identified as Plaintiff's Exhibit No. 2.)

Q I'll show you what's been marked as McGaughy Exhibit 2. Is that the document to which you referred as item number eight on page two of your report?

A Could be. And when I say could be, I mean it doesn't look like -- what I have is a letter from Rob's paralegal and from you forwarding it to -- so I mean it looks a lot like it. But can I verify that it's exactly the same thing? I would certainly take your word for it.

Q Well, I don't know what you were given, so I can't give you my word that this is the same. This is the only thing we filed.
A I guess I don't know.
Q Well --
A I mean I think it is.
Q Okay. There was another document that had the caption of the case on it and was called Connecticut Yankee's statement of position without the Roman numeral two designation. Did you know that?
A I may have it, but I don't recall that right off. Or if I would have, I would have put it on here.
Q What did you do to prepare the list that is on page two of your report? What steps did you take to identify the documents you had reviewed when you were putting together your report?
A Well, I just looked around my office and put down the things that I used when I prepared the report.
Q And as best you know now, that was accurate at the time you made the list?
A That's correct.

Q Except to have omitted the legal cases you looked at?

A I didn't look at those when I wrote this report.

Q Well, when you say documents reviewed, you don't say anymore than that they were reviewed in this engagement. Am I missing something?

A Well, we can -- I can -- when we make corrections, we can say document reviewed in preparing this report. How about that?

Q So you didn't look at any of those legal cases in preparing your report?

A No.

Q Where did you find --

A And that was about probably a year before.

Q Now when did you start work? How long after Mr. Stewart contacted you did you begin working on this engagement?

A Oh, it took two or three months -- the Justice Department takes a long time on contracts, so it was two or three months probably.

Q Could you give me a month or a

quarter of a year in which you started work?
A Probably September of last year. Maybe October. Probably September.
Q September or October of 2004, probably September?
A Yes.
Q And did you memorialize the engagement in an engagement letter?
A I have a contract.
Q Does the contract describe the work that you are to do to fulfill your obligations under the contract?
A Yes, in a vague sort of way.
Q What do you remember about the description of the work that you are to do from the contract?
A I mean it says something like review documents, help prepare discovery, write a report, testify at trial about that detail. It may be more than that, but that's about it.
Q And it specified your rate of $232 an hour?
A I think so. I think that's in the contract. I'm sure it is. The reason I -- when I got this number to put in this report, I

went and asked our billing people. I didn't go look at the contract. I probably should have. But that's what I'm billing them and they're paying, so I'm not sure what the contract says.

Q Now how many hours have you worked on this engagement so far?

A Let's see. So far probably 200 maybe.

Q You didn't start working in advance of receiving the contract in September or thereabouts of last year?

A No.

Q So those 200 hours all were spent from the date you received the contract until today?

A Right.

Q Two hundred hours.

A Now I can -- I mean I'm not sure that's exactly right, but that's -- I can find that out.

Q Are you confident that it's close? That's all I need to know. I don't need to know the exact number, but I don't want you to be off by 50 hours out of 200.

A I could be off 50 hours.

Q You could?
A I'd be happy to find out at a break.
Q All right. I'd appreciate it if you would, and I'll make a note to ask you after the break.
Now of those hours, how many do you think were spent in preparing your report?
A Sixty maybe.
Q Sixty. Okay. Is that something --
A Or less. I'm not sure.
Q Is that something that you could find out with greater confidence over the break, too? Because I don't want to put you in the position of guessing.
A I could roughly, but to find out I would have to go look at my time sheets. I mean I'd look at my time sheets. Other people couldn't look at my time sheets and tell that.
Q Well, then I'm not -- I don't want to ask you to do that. So did you work on this engagement alone or with colleagues at GDS?
A I had some help.
Q From whom?
A Well, Mr. Cary Cook is a CPA, and

Teatha Xayasith, I don't know how to spell it, who is a co-op student.

Q So a student, is that what you mean? I don't know what a co-op --

A A college student who will work for us a semester and go to school a semester, engineering student.

Q While he was working with you, that's all he would do?

A That's a she.

Q That's what she was doing for that period of time? She was working full-time for you?

A No. No. She probably has 15 hours or something.

Q Fifteen hours. And what about Mr. Cook? That is Mr. Cook?

A That is Mr. Cook. He probably has 15 hours.

Q And did he look at other financial information that was relevant to the case?

A Yes.

Q Now on the third page of your report you list -- well, I don't think I have that right. It's on the page numbered two.

You list three questions --
A Yes.
Q -- that you say were posed to you by the Department of Justice that you were to address in this engagement; right?
A That's correct.
Q And you have quotation marks around them?
A I do.
Q From what are you quoting?
A From my instructions from the Justice Department.
Q Were they in writing?
A They were.
Q Were they in the contract that you received from the Justice Department?
A They were not.
Q When did you receive those instructions?
A Well, before I wrote this report, so around the first of August.
Q The first of August of 2005?
A Right.
Q What had you been told in advance of that that you were to do? Let me start --

I'm taking that back. You said that the initial instructions that you were given by Mr. Stewart were to review some legal cases and some materials that he provided you in the case; correct?

A Right.

Q After you had done that, or while you were doing that, did he give you any additional instructions as to what you were to do?

A No.

Q Never until August of 2005?

A Well, I mean he would tell me to read this stuff and help me prepare some discovery, and it was not clear until when this -- when I got this letter that we were going to write a report. Maybe it was going to settle or whatever.

Q You expressed a point of view to Mr. Stewart, and I don't mean to characterize it, the record will show what it was, but you expressed a point of view to Mr. Stewart in the fall of last year regarding the connection you saw or didn't see between contracts and items of work for which Connecticut Yankee was

claiming the investment tax credit; correct?
A Let me -- I'm not sure what the record shows, but let me correct the record if it says something different from what I'm about to say. And what I said was that looking at that contract, I cannot see a direct connection between that contract and the expenditures for which they wish to receive investment tax credit.
Q And you said that in the fall of last year?
A That's correct.
Q So you knew in the fall of last year that you were being asked to look at some connection between the contract and items of work; correct?
A Correct. I guess that's correct. Yes.
Q How did you learn that that's what you were to do?
A That's what this case is about. That's what Mr. Stewart asked me to look for.
Q When did he ask you to look for that?
A It's probably in our -- when I

started work.

Q Now the questions that you quote on the page numbered two of your report speak in terms of certain kinds of connections. For example, you use the term readily ascertainable, easily -- the term easily determined. Do you see that?

A I do.

Q Was that part of the description that Mr. Stewart gave you initially before you began work as to what you would be asked to do?

A Well, this is his language, and it may be language from a case or from the law. I'm not sure.

Q But what I'm asking you is not the source of the language, but the timing of your receiving it. When were you first told by Mr. Stewart that he wanted you to use this connection or to ascertain -- sorry. When did he first tell you that he wanted you to assess whether or not items of work were readily ascertainable or easily determined? When did he first tell you that?

A In this letter.

Q Not before?