# EXHIBIT B
# PART 2 OF 3

A Not before.

Q But before then, long before then, you knew you were supposed to determine some connection or assess some connection?

A That's correct.

Q But you didn't know what kind of connection?

A Well, no. And the reason I can say no is because when I was asked to write this report, I said, well, you know, I've looked at all of this stuff. Now give me a letter, and tell me exactly what it is that I want to look at. And I've rendered a big opinion on everything. I'm looking at some specific facts, and based on that and my experience, and you tell me what you want me to look at, and I'll do that.

Q But you had already --

A And that's the first time that I had seen that put in this context.

Q But before you had been given the specifics, you had rendered a big opinion, you say. What was the big opinion that you had rendered?

A I didn't say that I rendered a big

opinion.

MR. KAUFMAN: Would you read back his last answer, please.

(Whereupon the court reporter read back the referred-to portion.)

Q What was the big opinion on everything that you had rendered before you were given the specifics?

A No. If I said that, and I guess I did, I would be referring to the opinion here.

Q Here where? Where are you pointing?

A (Witness indicated.)

Q You hadn't written the report at that point?

A If I'm going to render a big opinion, I need you to tell me specifically what it is that you want me to do. I'm not the most glib person.

Q Before Mr. Stewart sent you the letter from which you quote on page two of your report, you had not associated the term readily ascertainable or the term easily determined with this engagement; is that correct?

A Well, I mean that term may have

been in some of the things I read, but I had not been asked to do these things.

Q That wasn't my question. My question was whether you had associated the phrase readily ascertainable or the phrase easily determined with this engagement before receiving the letter from Mr. Stewart from which you quote on page two of your report?

A I would say not.

Q Did Mr. Stewart describe in the letter asking for your specific opinions what was meant by either of those phrases?

A Well, the letter speaks for itself, and I don't have a copy of it here, but I don't think so. But he elaborated on that.

Q Did he say anything to --

A There was a page and a half letter, so --

Q You have to let me finish the question before you can answer it. And the question was, was to be, whether he said anything about the meaning of those phrases, and it's your recollection that he did not; is that correct?

A Well, we certainly discussed the

letter. Now whether the letter says anymore about what those phrases mean, I don't think so.

Q What discussions did you have with Mr. Stewart concerning the meaning of those phrases?

A Well, I asked the question when he has the supply contract that we're talking about, the power supply contract, which, you know, supply contract could be lots of things. And so I inserted that word. That's not in the letter. That's one thing. It pretty -- I think the rest of it is pretty self-explanatory.

Q So that's what I'm trying to find out from you, though. Did Mr. Stewart give you any guidance as to what was meant by readily ascertainable?

A I don't think so.

Q And he gave you no guidance either about what was meant by easily determined?

A I don't think so. That's up to me.

Q So it was your understanding that you were supposed to employ your understanding of those phrases in rendering your opinions?

A That's correct.

Q Was your understanding guided by the cases that you reviewed, the legal cases you reviewed?

A No.

Q So you used your understanding of those phrases uninformed by any guidance from the Department of Justice and uninformed by any guidance from legal cases; correct?

A Well, as I said, I had read the cases a year before, and we'd discussed the case over a year.

Q Did the reading of the case influence your understanding of the phrase readily ascertainable or the phrase easily determined?

A No.

Q Did any of your discussions with Mr. Stewart about the cases inform your understanding of the phrase readily ascertainable or the phrase easily determined?

MR. STEWART: Objection.

MR. KAUFMAN: On what basis?

MR. STEWART: Out of lack of foundation. I don't think he testified that he

talked to me about the cases.

MR. KAUFMAN: I thought he just did, but fine.

Q If you didn't speak to Mr. Stewart about the cases, then please say so in your response.

A Well, you'll have to repeat the question.

Q Yes.

MR. KAUFMAN: Would you please read back the question.

(Whereupon the court reporter read back the referred-to portion.)

A I don't think so.

Q In the statement of the issues, you quote from the letter from Mr. Stewart. You also refer to related documents. Do you see that?

A No. It's there, but tell me where it is. Tell me where you're talking about.

Q The last two words of the first question and the last two words of the second.

A Yes.

Q First of all, did the letter from Mr. Stewart explain what was meant by related

documents?
A I don't think so.
Q Did you have any discussions with Mr. Stewart about what was meant by related documents in that context?
A Well, I'm sure I told him what I considered to be related documents.
Q And we'll come to that, because you say in the report also what you considered to be related documents, but now I'm looking for information flowing the other way.
Did Mr. Stewart tell you anything about what you were to understand related documents to mean in this engagement?
A No.
Q Was your understanding of that phrase in this engagement informed by the legal cases you read?
A No.
Q Was it informed by anything unique to this case?
A Unique to this case? Well, I discussed with my partners, which we do a lot of this power supply kind of work, and what we would consider related documents, and we

discussed that here.

Q So the statements that you make in your report about which documents you considered to be related to a power supply contract, those statements were the result of conversations you had with your partners?

A That's correct.

Q And your own experience, I understand?

A That's correct.

Q But those statements about what documents are related were not informed by Mr. Stewart or by legal cases?

A No.

Q If we look still at that same page, in the question numbered one, you have the disjunction readily ascertainable or easily determined. Do you see that?

A I'm not sure that I know what a disjunction is.

Q Either/or. You know, the statement is --

A I don't have it. The letter from Mr. Stewart has it.

Q Yes. And you quote that portion of

his letter?
A That's correct.
Q Now did you understand those two phrases, readily ascertainable or easily determined, to be synonymous?
A No, they're not synonymous.
Q What's the difference between them in meaning?
A Well, let me back up. I'm not sure this answers the question, but in my looking at specific items, I would look to see whether it was readily ascertainable or easily determined, and I would consider that as one thought. So now whether -- if you want to discuss English, I'll be happy to do that. But that's the way I used it in my preparation of this report.
Q Would you have done anything different in the preparation of your report if you had been instructed regarding ready ascertainment, but not easy determination?
A If this sentence, if the or easily determined was not there --
Q Okay. Let's put it that way. Would you have done anything different?
A I don't think so. I'd think about

that, but I don't think so.
Q And if readily ascertainable were missing, but easily determined was still there, would you have done anything different?
A I don't think so.
Q Now you say in the report what you understand to be related documents to a power supply contract, and I think you say that beginning on page three of your report and carrying over onto the next page. I just want to make sure that you and I agree on that.
A I think it would be helpful if you let me make a correction.
Q Then please do.
A In the next to the last paragraph here.
Q On page three?
A Page three. The paragraph that starts the question.
Q Okay.
A Okay. The third sentence, while it was amended a number of times, not terms. Number of times.
Q Okay.
A Okay. And then down here in the

last phrase, it should say interchange agreements, transmission service agreements, scheduling agreements and others, not interchange twice.

Q Anything else at this point?

A No.

Q Thank you. I had assumed that the last use of interchange agreement there was just a typo.

A Well, you were correct in your assumption.

Q Okay. So now, if you would, please tell me am I correct that it's here in your report beginning on page three and carrying over onto the next page that you describe which documents you consider to be related documents to a power supply contract?

A That's correct.

Q Now is a subcontract to a prime contract, in your view, related to the prime contract?

A It could be.

Q Even if it's not an interchange agreement, or a transmission service agreement, or a scheduling agreement?

A Now wait a minute. Are we talking about the power supply contract, or are we just talking in general terms?

Q I'm trying to understand what's the source of your view. So maybe let me just ask you directly. Tell me what is the basis for your view that these three types of agreements, and only they, are related documents to a power supply contract?

A Well, first off, I don't think, and I may have, say that it's only these. But in power supply contracts, there often is a reference to an interchange agreement describing that, or to the others, or we have some that have a fuel management agreement that talk about how fuel is going to be handled, or talk about how the plant is going to be operated, who's going to operate it, and how decisions are made, and those kinds of things. And they're referred to in the power supply contract. But that's not the case here.

Q But I'm trying to find the criteria. So is it your view that if the power supply contract refers to another document, then that other document is related to the

power supply contract?
A That's an indicator. Yes.
Q Well, is there any document that is related but is not referred to in a power supply contract?
A I would say generally not.
Q Well, ever not? I mean I want to understand --
A I don't know about even ever.
Q I want to know how you decide whether this document is or is not related to a power supply contract. Tell me how do you decide that?
A Well, one way would be when I look at this contract, do I need to go back to the power supply contract to fully understand it. That's one way.
Q Are there others?
A Well, is it referred to in the power supply contract as a controlling or an influencing document, and is it -- the big picture of the power supply contract is to sell power from one point to another, from a supplier to a customer, and do these documents implement that contract or a related document

such as the interchange agreement or the other kinds of agreements help implement that power supply agreement, or a fuel management agreement, for instance, and that probably would be referred to in the power supply agreement.

Q But now for a nuclear plant to supply power to its customers, it has to have fuel, and so a contract to procure fuel would be in furtherance to the supply of electricity to customers; correct?

A It is. And the people have to have air to breathe, and, you know, --

Q Right. But I thought you had just said that if a particular document was in furtherance of the supply of electricity to customers, then it was related to the power supply contract. And if that's so, isn't it so that procurement of fuel for a nuclear power plant is related to the supply of nuclear generated power to customers?

A Well, I mean you certainly -- as I said, in my opinion, you certainly have to have fuel. And so there is certainly a relation. I don't deny that. But in the context here of a

related document that is kind of on the level with the power supply agreement, I'd say not.

Q Well, where does the -- I want to know how you decide. Where does on the level of the power supply contract phrase come from in defining a related document? Where does that come from?

A It comes from my understanding of the industry and the discussions with my partners in my firm of what it ought to be.

Q Let me try to get at this a different way. Would you mark this as -- I think this has already been marked, but this copy of the stamp doesn't have a mark, so I'm going to mark it again. Would you mark this as McGaughy 3, please.

(Whereupon a document was identified as Plaintiff's Exhibit No. 3.)

Q Mr. McGaughy, do you recognize that as the original power supply contract for Connecticut Yankee? Take as much time as you want to satisfy yourself.

A It appears to be. Yes.

Q Now if you'd turn to the paragraph numbered four on the second page, it's titled

operation and maintenance of the unit. Do you see that?

A I do.

Q Let me just find the convenient way to ask my question. I'm not sure whether I'm doing it most efficiently. This is a nuclear power plant and has to be licensed to operate; correct?

A That's correct.

Q And the license is, therefore, related to the power supply contract?

A Well, I'll answer the question. But you have to have a license, and you have to follow the provisions of it, and that's the law of the land. And just so you know, there is a relationship I guess of some sort, but I wouldn't consider it a related document to this power supply contract.

Q It's not considered by whom a related document?

A By me.

Q And why not? That's what I'm trying to find out.

A Because it's not related to supplying -- it's not integral with supplying

the power to the customer.
Q You can't supply the first watt without a license; correct?
A That's correct.
Q So how is it not related to supplying power to customers?
A I mean you have to have the license to supply power. That's certain. But the license stands by itself as a contract between the -- well, it's in the contract. It's a law just like the guys have to obey the speed limit coming to work, and, you know, I don't consider the laws in the state of Connecticut to be part of the related document with the power supply contract.
Q Well, let's see if I can come at it again another way. The license is referred to in the power supply contract, isn't it, in paragraph number four on the second page?
A Yes, it is.
Q So, therefore, by your criteria, it is a document related to this document; right?
A I said there is a relationship. I mean it's --
Q Yes. And I don't mean to have you

repeat yourself. I just want to make sure the record is clear.

A You did.

Q Repeating yourself doesn't help you. I've got you. You're gotten. The question is I want to make sure that I give you every opportunity to be clear so there's no misunderstanding. A document that is referred to in the power supply contract and is necessary in order to perform the power supply contract still is not a related document to the power supply contract because why? Tell me.

A Well, in terms of the power supply contracts, obeying the law of the land is, you know, something that doesn't even need to be in here. Now there's a relationship to that, and the law, and the constitution, and the common law, but it doesn't have -- you know, that's something you've got to do. It's not varying the relationship of the parties involved in the contract, in carrying out the contract. So in that way, I don't consider it a related document to the power supply contract. This is motherhood and apple pie really. You don't need to say that. You've got to do that. If

it said we don't have to do that, it wouldn't have any meaning. I mean it's like the headings on the paragraphs. Maybe not. That's a bad analogy.

Q That's all right. I understand your point.

A Okay. Could we take a break here?

Q Sure.

(Deposition in Recess, 10:02 a.m. to 10:09 a.m.)

Q So now let's go through what you did in the performance of the engagement. You listed eight categories of documents that you looked through?

A I did.

Q Did you look at all of the documents in all of those categories? They're listed on page two of your report. The reason I asked is that the third one lists 17,898 pages.

A That's right.

Q Did you look at all of the documents in all of those categories?

A Yes. Put it this way. I put my hand on and looked at every document. Now some

of them, like the work order that I'll talk about later, is 1,000 pages, and every page is the same -- not the same, but it's a listing of costs that are assigned back to this project. And I kind of flipped through that, but I didn't read that.

Q Okay.

A So some of them -- so there are a number of them that I read the covers on and looked at the initial part, but didn't read the whole thing.

Q Did you do anything else in gathering information in the course of the engagement?

A Well, I went to our library and got the FERC Form 1's.

Q Yes. And you refer to them later.

A I went to the deposition of Dente. I don't think there's any other data sources that I used that were not supplied by you.

Q All that was supplied by Connecticut Yankee was included among the 17,898 pages or its statement of position, the items that you've listed here?

A Yes.

Q But I'm curious, why didn't you list the FERC Form 1's?
A I did.
Q Did you?
A Number two.
Q Okay. So then that's in addition to this? It's part of this?
A Well, you said in addition to these documents, all of these -- I interpreted that besides the stuff that you gave me, what else did you get.
Q I understand. Besides what you've listed here as the eight categories, were there any others that you looked at in the course of your engagement?
A As I said, I looked at Balducci and Dente. I attended the deposition yesterday. I thumbed through my prior testimony -- my reports. I saw that FP&L case. I've not read it.
Q I recommend it to you. You'll like it.
And when you read through all of these documents, what were you looking for?
A Well, I was looking for a

connection between the power supply contract and the items that are in this claim.

Q And I want to be clear about this, because I'm afraid I'm not. As you understood your assignment, you were to put on one side, metaphorically speaking, the power supply contract and related documents, and on the other side the items of work for which Connecticut Yankee is claiming the investment tax credit, and you were to see whether there were certain connections between those two categories; is that correct?

A Well, that is correct. But I was also looking, and I'm just trying to see where it says that here, maybe it doesn't, for contracts, it's kind of the next level maybe, contracts that were in place and binding in '85 that were carried out later even if they were not referred to in the contract -- in the power supply contract, although I don't think he specifically asked me to do that; can you look at this. But I was doing that. I was doing that also.

Q But now you have determined that in my two piles, in the one pile that has the

contract and related documents, there's only one document, the contract itself; correct?

A That's correct.

Q And --

A That's not to say that other documents don't exist, but they haven't been produced, not that I have seen in going through all of that stuff.

Q Well, we've been through, and I don't want to make you go through the criteria for determining whether a document is related to the power supply contract.

A Yes.

Q But I think the upshot of that was that no document that you ever saw in this case you considered to be related to the power supply contract; correct?

A No. I said it was not a related document, the power supply related document. I didn't say it wasn't related in some cosmic sense.

Q So the pile comprised of the contract and related documents had one member?

A Yes.

Q And then the other pile, you have

the items of work for which Connecticut Yankee was claiming the investment tax credit; correct?

A Yes.

Q And they divided it into fuel reloads in two cycles and capital projects?

A That's correct.

Q And what was the -- and the type of connection, let me just make sure this is right. The type of connection that you were looking to see existed or did not was one of ready identification or easy determination; correct?

A That's correct.

Q And that's a matter of just comparing, isn't it? Just comparing the contract, which is a single item, to the description of the capital projects and the descriptions of the fuel averages; correct?

A That's correct.

Q That's all that's required; right?

A That's all that's required?

Q To make the determination that you were trying to assess?

A Yes. Now I also, while I was at

it, looked to see if somehow these were the result of contracts that were no longer in place in 1985.

Q Understood. And maybe we'll come back to that. But I would like to go one thing at a time, if you don't mind.

A That's fine.

Q Okay. Now what did you look for in looking at these two piles to see whether there was or was not the requisite relationship? How would you know from looking at those two piles whether there was or there wasn't?

A Well, is there anything in the contract or related documents --

Q Well, let's just be clear. There's only one document in that pile; right?

A That's right.

Q Okay. So we're talking about just the contract?

A That's right.

Q Is there anything in the contract that does what?

A That specifies in some -- with some specificity the installation or purchase of this particular item.

Q And that's it; is that right? That's what you were looking to see was present or absent?

A That's correct.

Q You could do that --

A And I also looked at, you know, how that related to being in effect in 1985. I did do that.

Q Yes. I know. And I don't mean to say you didn't, but I also wanted to do one thing at a time.

A All right. Okay.

Q Okay. So that's a matter of reading the contract to see whether there is anything specific in the contract that calls out or describes the particular capital project or the particular reload, fuel reload that is in question; correct?

A Correct.

Q And you concluded in each instance that the contract did not contain a specific description of any of the items for which Connecticut Yankee was claiming the investment tax credit?

A That's correct.

Q And you determined that in each instance by comparing the description of the work to the language of the contract?

A That's correct. I did it on the basis of the information that was provided.

Q That's what I don't understand. How does the information provided affect the presence or absence of language in the contract that specifies the work for which the credit is claimed?

A I don't guess I understand the question.

Q Okay. The criterion that you're applying to determine whether the contract has or lacks the requisite relationship to the claimed item is whether the contract specifically refers to or describes the item of work; correct?

A Right.

Q How does any other information than the contract and the item of work enter into that consideration?

A Well, I think it helps to have an understanding of the contracts, and of the work, and why it was done, an understanding of

the industry. I think all of that information, background, helps.

Q But I don't see how, and that's what I'd like you to tell me. How does it help to have an understanding of the industry or anything else help you in deciding that the contract does or does not contain language that refers to the specific item of work?

A Well, I mean I guess I don't understand the question.

Q Why couldn't a high school student who is literate in English have looked at the contract to see whether it does or does not refer to a switchgear building and done it as well as you?

A Because the high school student could draw those conclusions, but the high school student could not say definitively, interpret what this contract says.

Q What is it in the contract that requires interpretation in order to determine whether it refers to the switchgear building?

A Well --

Q You have the contract as Exhibit 3. So if you would point to something there that

calls -- that is a potential candidate as a specific reference to a switchgear building.

A The high school student may think something with a gross capability of 490 megawatts is a switchgear building. What does that mean? I don't know. I mean does the high school student know that? I don't think so.

Q Okay. Anything else?

A Probably so.

Q I mean so basically --

A Western Massachusetts nine and a half percent, maybe that means, you know, that they need nine and a half percent of the fuel on October 19th. I mean I don't know. You've got to know what these things mean.

Q So you think that experience in the industry is relevant to interpreting the contract?

A I do.

Q Well, is there anything in the contract that is even arguably a reference of the kind that you think is required to have the requisite connection to a switchgear building?

A There's nothing in the contract, to my understanding or my opinion, that would --

that by reading the contract to see that it is readily ascertainable or easily determined that we have to have a new switchgear building.

Q But --

A In addition, there's nothing in here that tells you the amount of the property, what it costs for the switchgear. And then, finally, I think the switchgear building was necessary to generate power; therefore, to carry out the terms of the contract.

Q And I'll grant you that a person of your expertise is necessary to determine what is and what is not necessary to supply nuclear power, but you've answered questions that I didn't ask. The question I asked was whether there's anything in the contract that even arguably refers specifically to the degree of specificity that you think is required to a switchgear building.

A I said there was nothing in the contract. And I think that's kind of the answer in and of itself, isn't it? Is there anything, and I said there is nothing. I'm sorry.

Q Let's turn again to the contract

itself, which is Exhibit 3, paragraph number four on page two. In the first paragraph under that heading, do you see it? Are you on page two of Exhibit 3?
A I was on page four.
Q Sorry. Page two.
A Page two, paragraph four?
Q Section four. It's actually two paragraphs. There is a reference in that section four to outages for refueling; correct?
A There is.
Q So it's contemplated by the contract that there be refueling outages; correct?
A Yes. This is discussing outages and scheduling of outages, and there are a number of reasons to have outages among them that's refueling.
Q So there's a reference in the contract to refueling outages; right?
A That's correct.
Q And a person with your expertise who becomes familiar with the Connecticut Yankee plant as of year-end 1985 would know within reasonably short time frames when those

outages would have to occur; correct?

A I followed you up to the end. You said would know within reasonably short time frames? My time frame?

Q Sorry. A person with your experience who was acquainted with the status of the plant as of year-end '85. If you knew what was going on up at the Connecticut Yankee plant as of year-end 1985, such a person would know when fuel outages could be expected?

A No, because they didn't know either. At the end of '85, they were into big outages, and had a lot of problems. And they wanted to start up right away, and they couldn't start up until finally in May sometime. So they didn't know when the outage was going to be themselves. So I could not know.

Q So you couldn't know precisely, but you would know that it's roughly 18 to 24 months?

A Well, roughly. But I would have been wrong, because they had long extended outages after that. So I mean to say I would know when it would be, I could -- I would not

know.

Q You could predict, and you would not be right on the money, because lots of things might affect when the outages actually began and ended?

A At the end of -- I could predict, but I really couldn't predict in the end of '85, because they couldn't predict either.

Q And --

A I might have been right, and they would have been wrong probably. No. I mean people try to be very optimistic to keep things going in nuclear plants. But if you objectively look at it, you probably could have seen that it probably wasn't going to start up until June, or May, or whenever it was.

Q But those types of considerations, the type you just mentioned that rely on your experience and expertise in this business, were not among the factors that were brought to bear in your assessment of whether the contract does or does not specifically refer to the items for which Connecticut Yankee was claiming the investment tax credit; right?

A Well, they have an effect on

whether the contract was in effect in 1985 and whether that was work that was going to be done.

Q That's the question you keep wanting me to ask you about, but --

A You say it doesn't have any effect on what I'm doing, and I'm saying it does.

Q It's not on what you're doing. I'm sorry. Let me repeat the question again. Okay?

A All right.

Q One thing you were doing was assessing whether there was the requisite relationship between the power supply contract and the items of work for which Connecticut Yankee was claiming the credit?

A That's correct.

Q In your assessment of the presence or absence of that relationship, the factors that you just described based on your own expertise and experience did not come into play; correct?

A That's correct, I guess.

Q Now I'm going to ask you -- I'll let you answer about the contracts in effect in

'85, but first tell me where in your report do you express opinions on the question whether certain contracts were or were not in effect as of year-end 1985?

A Well, let's see.

Q This is your report, which is Exhibit 1.

A It is. I've got it right here. On the fourth page right in the middle in the last sentence above conclusions on capital additions.

Q And just so the record is clear, I'm going to read that sentence. Okay. What it says is, quote, "It seems clear that the work required in '87 through '90 was not readily ascertainable on December 31, 1985, from the power supply contract or from any other 1985 documents related or nonrelated", end of quote. Is that the sentence to which you are referring?

A It is.

Q Now what that sentence states is that the ready ascertainment relationship does not obtain between items of work and certain categories of documents; right?