# EXHIBIT B
# PART 3 OF 3

A It does.
Q Now you don't give any basis for that statement anywhere in your report, do you?
A Yes.
Q Where do you?
A Well, in that paragraph.
Q Tell me what is the justification for that statement earlier in the paragraph.
A Well, it refers you to Exhibit 6, which shows you that in '85 looking forward, they thought they had 127 million dollars worth of work, whereas you look at the year later it had grown to 173 million dollars. So, you know, they had a budget and kind of a scope, but they didn't really have a good idea for what all they were going to be doing.
Q Well, because the costs exceeded their budget, they didn't know what work they'd have to do; is that your position?
A No. These aren't costs. These are projections. So they had to add a lot of work and expand the scope. And so there's no -- do you want me to answer it?
Q Please. I don't mean to interrupt your answer. Please give it.

A So the evidence is, the only evidence there is is that they didn't have a clear idea of what was going to be going on. They were on contract supply. Their work orders -- and the work order is just a record of what you spend. It does indicate that there's a project in somebody's mind, and this is what's in somebody's mind, and it's clear from one year to the next that they didn't really know all they were going to be doing, and that's the only evidence there is that's put forward to support this.

Q To support what?

A The fact that these projects were known in '85.

Q Well, for each of the projects, the capital projects for which Connecticut Yankee is seeking the investment tax credit, there was an authorization that predates year-end 1985?

A There was not.

Q There were some?

A There were some.

Q And that is evidence that is not reflected in Exhibit 6; correct?

A Well, the budget is over here, and

I have work orders in here, so it's not in Exhibit 6. It's in my report.

Q But now so I understand your position, first of all, this was not an answer to any of the three questions you say you were asked to answer; correct?

A Well, I was looking at that. It looks that way at the moment.

Q You don't know why the projected cost --

A Neither do they.

Q Wait. Please let me finish. You don't know why the projected cost for construction projects increased from 127,964 to 173,540 in a year, do you?

A I don't know exactly. I know it means that they didn't know based on my experience and with no evidence to the contrary that they didn't know in '85 what all they were going to be doing in the future.

Q That may be, but it doesn't say that they didn't know all they needed to know about the particular projects. The '85 -- the second year's forecast might have included projects that were not even in consideration in

'85?

A I'm sure it does. But there are also budgets, you know, for '85 that turned out to be completely wrong, and that's not unusual. But the point is there was no specific contract that readily -- that will tell you what the work was going to be and what it was going to cost in '85. None has been put forward. Maybe there is somewhere, but it's in all of those documents, and nobody has -- Dente or Balducci have not put it forward since I wrote this report.

Q I'm just trying to understand your position. Okay. I got it. I've done my duty. I asked you about the area that you wanted to talk about, so we're done.

A We're done?

Q No. We're done with that.

A Okay.

Q I said I've done my duty with you. All right. I want to turn to the opinions that you expressed in the report on the subjects that you say you're addressing in the report. Those are the three that are listed on page two. And you do opine that the nuclear fuel

reloads in this period were necessary to run the plant?

A Yes.

Q And the capital projects you say were probably necessary to run the plant?

A Yes.

Q Before you can answer either of the other two questions that you list on page two, you need to have working definitions of readily ascertainable and related documents, do you agree with that? Because those questions use those phrases.

A What about easily determined?

Q Okay. That's another way you need to know.

A Okay.

Q So what was your work -- I've asked you this I know, and I don't mean to have you repeat yourself, but I don't think I have a full grasp of the answer. What was your working definition of readily ascertainable? When you have this contract and this item of work, how do you know whether they have that relationship of ready ascertainment or not?

A Okay. I would look at this

contract, and I'd say does it say they should have 56 fuel assemblies to install in 1990, and it doesn't say that.

Q And you do that with each of the items of work?

A That's correct.

Q And for easy determination, that is in order to determine whether there was an easy determination from the contract of the item of work, you do the same thing in that, the same comparison?

A Yes.

Q And you've already said that in this instance, the only document that was available as the contract or related documents was the contract itself? That was your working conclusion?

A Yes.

Q So all of your work in answering those two questions about readily ascertainable and so on was a matter of looking in the contract to see whether there was a specific reference to the item of work that was claimed for which the credit was claimed?

A That's correct.

Q Now we go back to the power contract, which is Exhibit 3. I think you have it right there. I think that's right.
A Okay.
Q Again in that paragraph that we looked at before which is on page two and it's numbered four, there's a reference to good utility practice.
A Yes.
Q Do you see that?
A Uh-huh (affirmative).
Q Now your report says prudent utility practice. This is on the fourth page of your report. I think it is. Let me see. The paragraph numbered one toward the bottom of that page, "My conclusions or determinations considering the capital addition projects are as follows". And then the paragraph numbered one, you have quotation marks as a reference to the contract prudent utility practice.
A Well, I would say that's an error.
Q It should be good utility practice?
A I may have gotten that somewhere else, but, as we said, I think that should be

good.

Q And are you familiar with the phrase good utility practice?

A Yes.

Q And what does it mean?

A Well, it depends on who you ask really, but to me it means to manage the work in an efficient businesslike manner consistent with the way it's done in the industry. It doesn't demand perfection. But if your negligence -- if something is negligent, it probably wouldn't fall under good utility practice. And there have been many cases about it.

Q And a person with your expertise and experience given enough information about a project and the circumstances surrounding the project could determine that the project was or was not done in accordance with good utility practice?

A I could, yes.

Q And I'm not asking you -- you don't purport to say that you have done that in this instance?

A I have not done that.

Q But you could? That is within the canon of things you could do?
A I could do that.
Q But you didn't do that here?
A I did not do that here.
Q But the contract does call out operating in accordance with good utility practice, and it is ascertainable by someone of your expertise and experience whether the capital projects claimed were or were not done in accordance with good utility practice?
A That's correct.
Q So if that's readily ascertainable, then by that definition of readily ascertainable, it would be readily ascertainable that the projects were or were not readily ascertainable from the contract?
A I --
Q You don't need to answer. I'll withdraw the question.
A All right. I won't answer it. All of these outages have been reviewed by the Connecticut commission and others, and they have findings, and I do not attempt to second guess them one way or the other.

Q It's your understanding that those regulators would be assessing, among other things, whether the work involved was done in accordance with good utility practice?

A They would have a standard, and it would be similar to that. I don't know if it's good utility practice or what. Whatever standard they use.

Q Now let's look at the particular project that you use as an example, and that's on page three of your report, the switchgear building.

A Yes.

Q Now you learned yesterday I think at Mr. Dente's deposition that the copy of the inspection report that you included in your report was incomplete, didn't you?

A I didn't learn that. I mean it's not -- the inspection report is much longer than this. What they included was not -- well, this is not the complete inspection report. Yes.

Q And you learned at Mr. Dente's deposition yesterday that the fuller one has many more specifics than the excerpt than you

included?

A Well, I didn't learn that, but I knew that. But it's only about ten items.

Q Go ahead, please. It has about ten items?

A Yes.

Q So you knew at the time you wrote your report that the excerpt you included lacked specifics that existed in the inspection report?

A The inspection report is a long report. It refers to a new switchgear room. And I didn't put the next page, which has a list of items on it.

Q But now --

A I could add that.

Q Let's look at page three of your report.

A Okay. Mr. Dente I assume --

Q You should let me ask you a question.

A Well, I'm finishing. Okay. It had that part circled, which meant to me that's in her summary, and I assume that was what I was supposed to look at, so I put that in there. I

saw the next page. But anyway --

Q Isn't it accurate to --

A Where are we looking?

Q Page three of your report. Isn't it accurate that in your report, you say that one of the reasons why the work involved in the switchgear building was not subject to the investment tax credit is that there was too little detail about it in the documents that Connecticut Yankee put forth in support of the claim.

MR. STEWART: Are you reading from his report somewhere?

MR. KAUFMAN: No. If I were, I would have quoted it. But that's the message that that portion of the report is intended to convey. But I'll let the judge figure that out himself, if need be.

MR. STEWART: Ask him that question.

MR. KAUFMAN: I just did.

Q Isn't that what you say? Isn't that the message that you mean to convey about the switchgear building? What you say is this is the biggest, it's going to have the most

detail of any of them, and look how little detail there is in this one; right?

A Right.

Q And yet you omit detail that you know exists?

A I don't really consider that detail. I mean detail --

MR. STEWART: I'm just -- I'm going to object, because he lists -- he lists four items there as information backup. I don't think -- and he lists the inspection report. So I don't think he's purporting that Exhibit 5 contains all of that material.

MR. KAUFMAN: Actually, Exhibit 5 contains none of it. It's Exhibit 4. But your objection is noted. He's answered the question.

Would you mark this as Exhibit 4, please.

(Whereupon a document was identified as Plaintiff's Exhibit No. 4.)

Q I'll show you what's been marked as Exhibit 4. Could you say what that is, please?

MR. STEWART: Just to be clear for the record, this Exhibit 4 that you just handed

him is not the Exhibit 4 that's in his report. They are two different Exhibit 4's.

MR. KAUFMAN: Correct. This is Exhibit 4 to the McGaughy deposition.

MR. STEWART: Because we've been talking about another Exhibit 4.

MR. KAUFMAN: Thank you. McGaughy Exhibit 4, although that is, too, isn't it? And who's on first?

Q So have you looked at it? Can you tell us what that is?

A This is inspection report 50-213/89-13.

Q And this is a fuller version of the document that you've included in Exhibit 4 to your report; correct?

A That's correct.

Q And on the page numbered three in Deposition Exhibit 4 under the section heading 3.0 new switchgear building --

A Yes.

Q -- there is a description of elements of the switchgear building.

A That's correct.

Q And those are details concerning

the switchgear building?

A I don't know about details, but they are a listing of what's going to be done in the switchgear building.

Q And that was not included in your -- in the excerpt that was put in your report; correct?

A That's correct.

Q And you knew it existed?

A Yes. Yes.

Q So why did you omit it?

A Okay. This morning I went out and got the sticker on my wife's car, because they wanted to find out -- she has to have a mirror replaced on this car, and it's got some little wires and stuff, and, you know, for the purpose of telling you about her car, I can tell you she has a '99 Lexus RX300. But if you want to know other things about the car, then you've got -- the dealer didn't know either about what was on the original car to order replacement parts. So I went back and looked at that list. And this, this is like they had to put it in a new car. That's fine. And then this is the sticker for some of the stuff that's on the

sticker. And I didn't miss all of that, as I did not -- the work order is whatever I say, 1,400 pages, and I didn't put all of that in there, but I did put the top page so you could see that it existed, and this is the inspection report.

Q Now the inspection report states on the third page of this deposition exhibit under the heading areas inspected --

A I'm sorry. Where are you?

Q It's the third page. There's no number.

A I've got page three here.

Q Not numbered three. The third ordinal page of the exhibit. Just turn to the third page of the exhibit, not numbered three.

A Yes.

Q Under the heading areas inspected at the bottom of the page.

A Yes.

Q The nuclear regulatory commission inspectors who wrote this report say that this building was constructed to comply with appendix R requirements. Do you see that?

A Yes.

Q Now the NRC has the authority, you understand, to approve or disapprove means by nuclear plant operators to comply with legal requirements; correct?

A The NRC interprets what the legal requirements are and can impose them on licensees. I'm not sure if that's exactly what your question was, but if that answers it --

Q I think it does. Thank you. Okay. Got it.

Now I want to show you a copy of Mr. Dente's report that we'll mark as an exhibit to your deposition just so it's clear exactly what the document is.

(Whereupon a document was identified as Plaintiff's Exhibit No. 5.)

Q Now I'll show you what's been marked as McGaughy Exhibit 5. Do you recognize this as a copy of Tom Dente's expert report in this case?

A Yes.

Q And I'm going to go through some paragraphs in the report to see whether you agree with them or not.

A Okay.

Q And these are found beginning on page five at the bottom. Well, let's start at fuel on page five. If you would, read to yourself paragraph number 13, the first sentence. Is there anything in that sentence with which you disagree?
A Well --
Q And if you can't --
A I mean that could be true, but when they initially designed it, what the cycle was going to be, I don't know.
Q You don't know whether that's true or not?
A I have -- there are some documents that you have supplied that may indicate that and could very well be that.
Q Yes. And on any of these questions that I ask you in this section of my questioning, if you don't know the answer, don't -- I'm not asking you to pick one and guess at one, and I'm not expecting that you do know the answer to all of these. And if you don't know, just tell me.
A Okay.
Q In the paragraph numbered 14 on

page five, there are several statements. Please read them to yourself and tell me do you agree with them. Do you know them to be true?

A The whole thing or --

Q Yes. That's right. And if the answer has to be some and not others, then we'll go through it.

A Okay. That could be true. And when I say it could be true, it's that sometimes you buy fuel, people have bought fuel, you buy the whole thing. And sometimes you buy UF6 directly and have it converted, and sometimes you can buy enriched uranium. So that's certainly a way it's done. It's often done that way.

Q In paragraph number 15 on that same page is a single sentence.

A Wait. Excuse me.

Q Go ahead.

A In 14, the first sentence is generally true, but there are times when you'll buy some at the last minute, find some from somebody else. And when they had to do eight additional fuel assemblies, it would -- I don't know what they did, but they could have very

well bought some off-the-shelf uranium that somebody had. So I mean that's generally how it's done, but not always.

Q Okay. Understood. Number 15, is that something you know to be true?

A That's a good way to do it. It's not always done that way.

Q Do you have in --

A It does not make it necessary.

Q Well, if you want to comply with good utility practice, you would do it this way?

A You would -- it would be a good way to do it. Put it that way. But doing it a different way would not necessarily be not good utility practice. It just depends on what kind of deal you can get. And this might be a bad way to do it if you can buy some cheap fuel somewhere else.

Q Do you have any reason to think that was true in this instance?

A I do not.

Q And I think just -- I don't want to belabor this with you. Have you looked through the paragraphs numbered 17 through 48 of Mr. Dente's report that begin on page five and

go over to page eight? Have you looked at them before?

A Yes.

Q And was --

A Wait a minute. Before what?

Q Before today. I think you said you looked at his report.

A Yes, I have.

Q Is there any in there that you disagree with? I understand that you may not be able to corroborate them. I'm not asking you to say they're true. But is there any that you know not to be true or you believe not to be true?

A No.

Q Well, then I have no further questions for you.

A Thank you.

Q That's it.

(Deposition in Recess, 11:00 a.m. to 11:08 a.m.)

Q We're resumed. Mr. McGaughy, you were able to relearn from your office answers to earlier questions about time spent on this engagement. Could you please tell us what

you've learned.

A Okay. Through July, and I would say that's prereport, there's a total of 241.5 hours charged to the project. And it's another exercise to determine exactly whose hours those are, but they're probably all but about 15 or so mine.

Q Okay.

A Okay. Now August, I have 39 hours, Peggy Hicks has .75 hours, Wayne Miller has one hour, and Lisa Wilson has 1.75 hours, and the lady named P. Teatha Xayasith has 11.5 hours. She's Laotian.

Q What is her area of expertise?

A Well, she's a co-op student, and I had her go through different tables and actually compare what Balducci said, and what Dente said, and the projects, and what your exhibit -- your statement of position said, and what Exhibit 15 said, trying to -- made a matrix and see how that all fit together.

Q So she was the person whose name you didn't previously remember how to spell; is that correct?

A That's right.

Q Okay. Well, thank you. You've been very helpful. I appreciate it. I have no further questions.

(Deposition adjourned, 11:10 a.m.)

I, JAMES P. McGAUGHY, JR., Deponent, do hereby certify that I have read the foregoing deposition, and the same is a true and accurate transcript of my testimony, except for the changes listed below, if any.

PAGE/LINE/CHANGE REASON

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

If additional space is needed, please attach separate sheet(s) and indicate number of additional page(s) here:________

___________________________________

JAMES P. McGAUGHY, JR., Deponent

______________________________(Notary Public)

Date Notarized:_____________________________

My Commission Expires:______________________

Donovan Reporting, P.C. FAX: 770-428-5801
237 Roswell Street, Marietta, GA 30060

Date of Deposition: 9/9/05 CR: MLH

Pursuant to OCGA 9-11-28, I hereby disclose that I am an employee of Donovan Reporting, P.C., and have been hired by the deposing attorney to provide reporting services for this deposition. There is no special fee arrangement between Donovan Reporting, P.C. and the parties and/or attorneys in this deposition aside from our regular and customary fee schedule; further, I have not entered into any contractual arrangement other than for the taking of this deposition, financial or otherwise, with any person or entity in this matter and am taking this deposition in full compliance with OCGA 15-14-37. Fees are charged for originals and copies of depositions depending upon the circumstances of each deposition, including but not limited to location of deposition, length of deposition, expedited requirements, medical experts, video, exhibits, waiting time, travel, realtime, etc. A complete detailed fee schedule is available upon request. This disclosure was provided to all counsel at the commencement of the deposition and is hereby incorporated into and made a part of the transcript.

C E R T I F I C A T E

GEORGIA

COBB COUNTY

I hereby certify that the above and foregoing pages 1 through 86 are a true, complete, correct and exact transcript of my shorthand notes taken in the above-referenced matter;

That same constitutes a true, complete, correct and exact record of the above-referenced matter;

That same was transcribed through computer assisted transcription;

That I am not of kin or counsel to any of the attorneys or parties, nor am I in the regular employ of any of the attorneys or parties;

This __________ day of __________________________, 2005.

______________________________

MARTHA L. HUFSTETLER, B-778

Certified Court Reporter