# EXHIBIT C

# TRANSCRIPT OF PROCEEDINGS

CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
Plaintiff, )
) Docket No. 04-0085T
v. )
THE UNITED STATES, )
Defendant. )

DEPOSITION OF THOMAS J. DENTE

Pages: 187 through 226

Place: Boston, Massachusetts

Date: September 8, 2005

**HERITAGE REPORTING CORPORATION**

*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-0085T |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

THE CONTINUED ORAL DEPOSITION OF THOMAS J. DENTE, held pursuant to adjournment, and the applicable provisions of the Federal Rules of Civil Procedure, before Marguerite Summers, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, at the offices of Ropes & Gray, One International Place, Boston, Massachusetts, on Thursday, September 8, 2005, commencing at 9:30 o'clock a.m.

APPEARANCES:

G. ROBSON STEWART, ESQ.
Senior Trial Attorney
US Department of Justice, Tax Division
PO Box 26
Washington, DC 20044
202 307-6493

LEVINA WONG, ESQ.
Ropes & Gray
One International Place
Boston, 02110
617 951-7903

James P. McGaughy
GDS Associates, Inc.
185 Parkway Dr. Suite 800
Marietta, GA 30067
770 425-8100

# INDEX


| WITNESS: | | PAGE |
|---|---|---|
| Thomas J. Dente | | 190 |
| **EXHIBITS:** | **DESCRIPTION** | **PAGE** |
| No. 35 | Report | 191 |

## S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED TO, by and between the parties and their respective attorneys, that all objections, except as to the form of the questions, shall be reserved until the time of trial; that the filing of the deposition be waived; and, that the witness may read and sign the deposition without any Notary Public being present.

P R O C E E D I N G S

(9:30 a.m.)

T H O M A S J. D E N T E, having been sworn by a Notary Public to tell the truth, the whole truth and nothing but the truth, testified upon his oath as follows:

(Report marked Exhibit No. 35.)

EXAMINATION BY MR. STEWART:

Q Mr. Dente, we're here to take your deposition with respect to the expert report you prepared on behalf of Connecticut Yankee. Since we deposed you earlier, I assume that you recall the parameters or procedures for the deposition so I won't bother going over them again. First of all, I'd just like to ask you if you prepared this report by yourself?

A I did.

Q You didn't receive any assistance from anyone else?

A I did not.

Q I'd like you -- do you have your report -- the report there with you?

A Yes, I do.

Q I want to ask you a couple questions. Going to the second page, Paragraph 8 is the materials you reviewed in preparation of the report. Item A is the Connecticut

Yankee proposed 1986 to 1991 construction program. Can you tell me why you looked at that?

A I looked at that because that would give me a sense of dollars that were spent before 19 -- the end of 1985 and also during 1985, which would indicate to me that a project was alive and well at that stage and therefore had been executed or started.

Q Now, did that proposed construction program budget, did that reflect the actual start date of projects?

A It did not reflect the actual start date of projects, no.

Q Did it reflect any of the specifications of particular projects?

A To some extent it does do that, and it does that under the individual projects.

Q Going down to sub-paragraph VV, the power contract dated July 1st, 1964, is that the only power contract you looked at?

MS. WONG: It's on Page 4.

THE WITNESS: Bear with me. I'm just getting to that page.

MR. STEWART: Sure. Take your time.

MS. WONG: I believe he said "VV."

THE WITNESS: Oh, VV. Okay.

A That was the only contract I looked at.

Q (by Mr. Stewart) I'm sorry, I didn't hear you. What -- could you repeat that?
A That was the only contract I looked at in preparation of this particular report.
Q But you didn't look at any of the contract amendments that were subsequently executed by Connecticut Yankee?
A No.
Q The -- going down to the next item, WW, you list the reload nuclear fuel supply contract between Connecticut Yankee and Babcock & Wilcox. Is that the only supply -- fuel supply contract you reviewed?
A Yes.
Q Going down to Subparagraph AA there, "memorandum with attachment, re Nuclear Fuel Cycle Administration," can you explain to me why you looked at that particular document?
A I looked at it just to refresh my memory as to the understanding of the separation of responsibilities.
Q Separation of responsibilities?
A For preparation of the various documents for procurement of fuel and -- and identification of the specifics for the fuel.
Q Are you talking about the different phases of the fuel procurement?

A No. The responsibility for defining the -- the technical terms of the fuel contract versus the purchasing department that would go out and secure the bids for the various fuel assemblies.

Q So, this just has to do with the actual fuel assembly contract?

A Exactly.

Q Going on to -- on Page 5, Paragraph 9, you stated, "By year end 1985 the Three Mile Island Commission and Nuclear Regulatory Commission imposed new requirements, capital additions, upon Connecticut Yankee that were necessary for Connecticut Yankee to retain its operating license." I'm a little confused by that paragraph. I'm not sure if there's something missing there. But can you explain that to me?

A Yeah. I think it would read better if there was the word "for" between "requirements" and "capital additions."

Q Okay. Now, when were these new requirements imposed?

A The requirements were started, and I've got to refresh my memory just for a minute here, Three Mile Island occurred and shortly thereafter by the 1980 time frame the various owners' groups came into being and with that came a number of reports from different commissions about what

happened at Three Mile Island, and from that, new regulations came about and they were sent to the industry in various forms, whether they're bulletins or circulars or information notices, generic letters. There were reports issued by the Nuclear Regulatory Commission as to what was acceptable and what was not acceptable to comply with the various new regulations. There were appendices issued to 10 CFR 50. There were modifications made to 10 CFR. So, a number of new requirements were issued following that particular event. And I think that what I mean by this particular opinion is that the Three Mile Island Commission had requirements issued which the NRC put into documents that would require utilities, nuclear utilities, to perform modifications, and NRC, along with that information and other things that occurred in the industry during that period of time, issued new requirements.

Q What other things?

A Such as ten utilities that were involved in the SEP program.

Q What's that?

A That's a program that was begun, I believe, in 1977, and it was to bring utility or nuclear units that were in service prior to 1975 up to standards that existed at that period of time, and they imposed requirements, as an example, on seismic analysis of piping systems and supports.

Q And what's the significance of that with respect to your opinion?

A The significance of that is that, and the point of this, is to show that the forecast of future events was very difficult when Connecticut Yankee was originally built and things change, and as a result of that, the new requirements have to be implemented by the individual nuclear operator in order to continue to function as a power producer.

Q Now, your next paragraph states that, "By year end 1985 Connecticut Yankee was committed by regulation to expend monies towards the capital additions." Are you -- well, let me just ask you to explain that, what you mean by that.

A In the process, and let me put a little context on this. I was in a position in the '80s and prior to that -- as a matter of fact, I attended the launching of the SEP program in Washington, D.C., in 1977.

Q I'm sorry. What was that? The FEP?

A SEP program.

Q What's that stand for?

A Systematic Evaluation Program. That was the one that issued the requirements for the older plants to bring their facilities up to new standards.

Q Oh. I thought you had said "FEP" before, so, I'm sorry, that's my...

A No. SEP. The -- the regulations that were put forth by the Nuclear Regulatory Commission were pretty well known by 1982, '83, '84, and certainly by the end of 1985 for those projects that would have to occur out in the next four or five years. In my position at that time with Northeast Utilities Service Company, part of my responsibility was to assure that the requirement, whether it was by an information notice or bulletin or other means of communication from the Nuclear Regulatory Commission, was thoroughly reviewed, that engineering, plant personnel, everyone knew what the requirement was, that discussions with the Nuclear Regulatory Commission through the licensing group occurred, and that we were able to come up with the best possible solution within the time frame that the Nuclear Regulatory Commission had imposed. And in many cases in these documents you won't see where the NRC says that something has to be completed by a particular time, but believe me, in those negotiations, they were pretty adamant about trying to prioritize the safe issues and getting them taken care of in a very timely manner, and when we set the dates to implement and the commitment dates for these particular activ -- capital additions, it was with the consent of either the nuclear resident and/or what was negotiated in most cases verbally with the Nuclear Regulatory Commission in Region One.

Q Is it true that the implementation of these NRC requirements varies by each individual plant?

A In most cases I think you'll find that's not true. I think that if, as an example, when the Nuclear Regulatory Commission issued 10 CFR 50, Appendix R, which required that a number of items, required lighting conditions in certain areas where operators would be required to go in to operate equipment and emergency lighting needed to be in place in order for the operator to see what he was doing, that that was pretty much universally understood as a fairly simple design, lighting that was in accordance with the requirements of the regulations, and those would be everything from the quality assurance and quality control requirements to the type of backup power supplies and redundancy that was necessary to assure that they would operate under all types of situations.

So, I think, in many cases you have plants that are very similar to Connecticut Yankee, in fact, you do, you have sister units of Connecticut Yankee that in discussion with the Nuclear Regulatory Commission and in discussion with those sister plants, either through the Westinghouse Owners' Group or through normal communications, and those would occur on a telephone -- on a telephone basis. If you were implementing something that another plant either had committed to or the time frame was there, the NRC encouraged

uniformity in implementing these requirements, and for several very good reasons, because it was easier for them to review to make sure that it would be consistent and could be consistently applied across all units.

Q You're saying that specifica -- would it be fair to say then that specifications for, using your example, the installation of that emergency lighting system would apply not only to the Connecticut Yankee plant but, say, another plant in Pennsylvania?

A It could occur -- it could apply to any of the plants that did not meet those requirements, that's exactly correct.

Q So, the exact specifications with respect to lighting units, conduit, circuit breakers, things along those lines, would all be identical?

A They would -- to the best of my knowledge, yes, they would be. First off, it's a fairly simple design to put a light in an area. The science is pretty well known to determine what the lighting has to be on the surface; therefore, the size of the light, the fixture, they all have to meet the quality control requirements, it has to be a redundant circuit, which means it has to come from diverse power supplies or two different power supplies. They have to meet separation criteria. So, you get -- you get a number of different requirements that the NRC already had in

place that have to be factored into the design of this, and by the simple use of those existing requirements, the designs are quite uniform. The differences would be in the length of the wire, the length of the conduit, but essentially you're going to have circuit breakers, you're going to have switching, you're to have different power supplies, you're going to have all of the components as a quality component because it needs to operate under accident conditions.

Q I guess my question is what -- the individual details of the length of the conduit and things along those lines would vary for each plant; isn't that true?

A That's true.

Q In Paragraph 12 you -- I'm sorry -- Paragraph 11 you state that Connecticut -- "By year end 1985, Connecticut Yankee committed by contract and regulation to expend monies towards the nuclear fuel reloads for which Connecticut Yankee is seeking transition ITC." Can you explain to me what you mean by that statement specifically with respect to "committed by regulation"?

A In the process of using nuclear fuel and the way I intended this to be used in this particular paragraph was that there are regulations that define the types of fuel that you can use and the requirements address peaking factors and other nuclear parameters that will occur in the

reactor during operation and also during transient or accident conditions, and that's what I was referring to. Connecticut Yankee had indeed committed by contract prior to the end of 1985 and regulations were in place to identify the fuel parameters, if you will, that are necessary to comply with the regulations. Perhaps that's a better understanding of that particular paragraph.

Q In Paragraph 12 you state that, "The nuclear fuel capital additions placed in service throughout 1986 through '90 were purchased to meet the requirements set out by the power contract." Were they -- when you reviewed the power contract, were they specifically referenced in the power contract in any way?

A In the power contract there is a statement, and I believe it was Item 4 of the power contract which is dated in 1964, and it identified the operation and maintenance of the unit, and unfortunately there were no fortune tellers at that time that could identify specifically the components that would need to be replaced or added to on that unit, so, the contract reads that you would use good utility practices under the circumstances and all applicable law, and that would govern the types of components, replacements, maintenance that you would use on the facility. And my interpretation of that is that that was sufficient to require the operator to act and to replace the individual,

or add the capital additions that are referenced in my report, and also to continue to refuel the unit so that it could continue to operate and, as spelled out also in that same paragraph, refueling outages, plural, were identified and that they would be scheduled in accordance with good utility practices, and to me that is a commitment that the unit needs to be refueled in the future and that capital additions and maintenance needs to be accomplished in the future and it sets the standards that need to apply to any of those capital additions or fuel reloads.

Q Going down to Paragraph 13 where you talk about the nuclear fuel more specifically, you state that, "The nuclear plant in Connecticut Yankee was designed with the expectation that nuclear fuel would be replaced and reloaded on a regular schedule approximately every 15 to 18 months." During the time period we're looking at here, is -- was that expectation met?

A Let me just make sure I understand your question. You're saying was the approximate every 15 to 18 months met during the time period '86 to 1990?

Q Right.

A It was not.

Q And what was the actual reload schedule then, if you recall?

A It was longer, without going through a couple of

documents and pulling up the specific dates, and it was primarily because of the long outages that occurred during that period of time.

Q I think we covered those before in your previous deposition, so, I won't ask you too much in detail, but could you just mention them briefly for the purposes of this deposition?

A What the dates were?

Q Well, no, what the -- what the cause of the outages, the extended outages were.

A During that period of time, Connecticut Yankee experienced difficulty with the thermal shield and repairs during the first outage had to be made to the thermal shield, and then in the second outage the thermal shield had to be removed.

Q And approximately how much time did that add to the reload cycle?

A Well, first off, understand that the reload, the fuel that was designed to be put in the reactor during this period of time was essentially and is identical to the fuel that was put in the reactor prior to this 1985 time frame. So, the operating cycle, the period of time that the unit was capable of producing energy, remained the same, it was about 390 to 400 full power days that the unit could operate. So, the difference here is the -- the length of

time that the unit was out of service for the refueling outages. Once the unit recovered from the refueling outage, refueling and maintenance outage, and began operating, it could continue to operate at full power for about 390 days, and so, the operating cycle remained essentially the same. The difference would be that the -- because of the outage lengths, the refueling schedule would be moved from what was planned earlier to a later date.

Q Now, is it true that the length of the refueling outage was unanticipated before the actual outage occurred?

A In ---

Q For the two refueling outages involved in this case.

A That's true. We had planned them much earlier; in fact, I had scheduled a much earlier outage with NEPEX, the -- the actual group that controls power -- power usage and distribution in New England at that time, and they required that you indicate to them the length and duration of -- I'm sorry -- the starting date and duration of your outage. So, the -- it would not have matched up with what was identified earlier.

Q Just for the sake of the record, that acronym you used, could you spell it out and tell us what it stands for?

A It stands for -- it's N-E-P-E-X, and it's Nuclear -- I mean, I'm sorry -- Northeast Power Exchange.

Q Now ---

A Or New England Power Exchange. I'm sorry.

Q We were talking -- we -- the two reloads that we -- we have referenced here are Reload 14 and 15; is that correct?

A Yes.

Q Now, you said that the Reload 14 had originally been scheduled for an earlier time period?

A Bear with me one minute.

Q Sure.

(Pause.)

A The -- the 1987 refueling, I believe, was originally scheduled to begin in, I think it was March of 1987.

(Long pause.)

Q Are you still looking?

A Yeah. I'll be right with you.

Q Okay. Wanted to make sure we didn't lose you.

(Pause.)

A I believe the -- one of the outages for cycle 15 was originally scheduled to occur in 1987. Still looking for the beginning date, the actual beginning date of that. I'm not sure I brought that reference with me, but bear with me one minute more.

Q Sure.

(Long pause.)

A It would seem that I have just about everything else that I need except the original dates of those outages.

Q Do you happen to know when the fuel assemblies for the Reload 14 were received by Connecticut Yankee?

(Pause.)

A Typically the fuel is received by Connecticut Yankee about a month or two before the actual refueling begins.

Q So, you don't know specifically when the Reload 14 assemblies were -- arrived at Connecticut Yankee?

A I don't have that document in front of me, no.

Q So, you think there is a document that would reflect that?

A Yes.

Q And can you describe what that -- where -- what that document might be?

A That document would be the refueling outage report.

Q What about the Reload 15 assemblies, do you know when those arrived at Connecticut Yankee?

A That, again, would be the same time frame, a couple of months prior to the need to put them in the reactor. I don't have a specific date for that.

Q Okay. Going down to Paragraph 14 of your report

where you state, "Uranium for a particular nuclear fuel reload was contracted for and purchased years in advance of the scheduled reload," can you be more specific as to how many years you're talking about there?

A The beginning of your reload nuclear fuel supply contract was entered into in April of 1985, and that contract, I believe, was good for four refuelings plus four additional ones. The work that was required to obtain the uranium for the fuel manufacturer would have been in contracts that would identify the withdrawal schedules and the delivery schedules for both yellow cake for the enrichment services and the other services necessary to be able to form the pellets and then put them in the fuel rods and deliver them to Connecticut Yankee.

Q The contract you referenced that was executed in April of 1985, is that the contract that you listed as Subparagraph WW, those nuclear fuel supply contracts?

A Yes, it was.

Q Now, the other -- you list four contracts here in Paragraph 14, the first one for the procurement of uranium, for yellow cake, did you review that contract?

A In writing Paragraph 14, what I did was to try to lay out the context for how fuel is purchased, and all I did here was from my own knowledge put in the various steps that are required, and knowing in my own mind that there are

contracts that do exist for these various steps, that's the -- the way the paragraph was written.

Q But you didn't actually review a contract that was in place with respect to the reloads we're talking about here?

A I -- I had reviewed one in the past so, it was present in my mind that I knew such a contract did exist.

Q And what about for the second contract you list for the conversion of uranium into gas?

A Uranium hexachloride, yes. And the same for the enrichment contracts.

Q You're saying the same answer that you gave with respect to the first contract?

A Exactly.

Q Now, Paragraph 15 you say the process for obtaining nuclear fuel made it necessary for Connecticut Yankee to contract for fuel five or six years in advance of a reload. Can you explain in more detail what you mean by that?

A The contract for the reload was written to accommodate five or six years down the road; so, in other words, if you wrote a contract, it would -- it would apply for, as the B&W case, the contract that was just referenced, was for four reloads, there would be future reloads stretching out five to six years in the future. That's what

the intent of that particular paragraph means.
Q But that paragraph just references the -- the fuel assembly contract?
A Not only the fuel assembly contract, but there are other contracts that we've just discussed that needed to be in place in order to support the contract for reload.
Q So, that, you're talking about all the -- all the contracts in that paragraph?
A That's correct.
Q So, in Paragraph 16 where you say, "Review of contracts, fuel and the reload were contracted for by Connecticut Yankee by year end 1985 and placed in service by 1990," you're saying that your -- I think earlier you said that the review of the contract other than the fuel assembly contract was something that you recalled from before, not that something you looked at specifically in this case?
A Correct. And "before" would have been during the period of time in April and May and certainly back during the period of time that I was actively involved with Connecticut Yankee in the -- in the early '80s.
Q And so, you're saying April or May of this year?
A Yes.
Q Going to Paragraph 17, you state, "The capital additions listed on the spread sheet on additional transition property, transitional property, were performed

because of government regulations. These capital additions were necessary for Connecticut Yankee to comply with good utility practice and to retain its operating license." Can you explain to me what the difference is between good utility practice and what's required to retain an operating license?

A Good utility practice for -- well, let me -- let me explain it this way. In order to retain its operating license, Connecticut Yankee had to make changes as required by Nuclear Regulatory Commissions -- Commission to comply with all the requirements and, therefore, continue to operate. The capital additions were necessary at Connecticut Yankee and needed to comply with good utility practice as required by the contract, which meant that the Connecticut Yankee had to act on information that was available in the industry and then put in place those capital improvements that were necessary to allow it to continue to operate. As an example, their replacement of the reactor protection system. The reactor protection system is a required system by federal regulation. The good utility practice comes in when that system has to be replaced because the previous system is no longer capable of providing the -- or satisfying the requirements that have been placed upon it by the Nuclear Regulatory Commission. It was adequate in the beginning. The regulations changed

as experience was built into the industry, and then as a result of that, good utility practice dictates that you will follow those regulations, that you will look at and compare with what the rest of the industry is doing in this regard and then complete the capital addition in accordance with a schedule that you work out with the Nuclear Regulatory Commission.

Q Now, Paragraphs 18 through 48 you list all the projects and -- not all the projects, but you list a number of projects and cite to the requirement or regulation which supports that project. Tell me how you were able to establish the start date of these projects?

A The start date for these various projects varied. In some cases it was readily identifiable in NRC inspection reports. In other cases it was identified as a result of reviewing of the budget where many of these were -- had expended dollars prior to the end of 1985 for these various projects.

Q Did the budget contain any of the specifications with respect to each of these projects?

A What do you mean by "specifications"?

Q Well, the specifications for completing the project, design specifications or material specifications.

A In other words, you're asking if it was an engineering document or a financial document?

Q Well, I guess I'm asking whether -- you say you looked at the budget and -- to determine the start date, and that the budget would show expenditures by year. Were you able to determine from the budget the specifications or the work that was actually performed by each year?

A No. It was a dollar amount that was provided by year and in some cases that dollar amount was expended in 1984, in 1985, or expended as of 12/1984, and then the dollar amount for 1985 was -- was there. As far as being specific as to a piece of conduit was installed or a piece of equipment was placed, it wasn't that specific; it was an outline of the steps -- not the steps, but the outline of a description of the project but not with that specificity.

Q Now, for each of these projects that you have listed here, were any of these projects any how referenced in the power supply contract?

A Not by specific name, no.

Q The regulations that you cite with respect to these projects, do any of those regulations specifically identify or refer to Connecticut Yankee?

A In the NRC communication, the NRC inspection reports would specifically apply to Connecticut Yankee. NRC bulletins, information notices, and generic letters, circulars, that type of communication was generally directed to all PWRs or all BWRs, PWRs meaning pressurized water

reactor, BWR meaning boiling water reactor. In some instances it was directed to a specific group of plants. And if your question was was CY singled out in the industry to receive a letter from the NRC saying that a certain item needed to be accomplished, I don't recall that.

Q You mentioned some NRC inspection reports. Did those inspection reports specifically identify the specifications and amount of any property that was going to be installed at the Connecticut Yankee plant?

A Typically, inspection report would identify, in some instances, the property that was going to be installed. As an example, in the switch gear room that was being built to satisfy the requirements of Appendix R, 10 CFR 50, Appendix R, the types of equipment that would be in there were identified.

Q Which project is that by your paragraph number?

A Bear with me one minute. 22400101, that would be Item No. 20.

Q Were there any other projects where the inspection report specifically identified property that was going to be installed?

A I used that one as an example. If you'd like, I can go through each one and identify each one for you.

Q Sure.

A If you would look at project 22390101, which is

No. 19, that is specifically identified in the inspection report.

Project -- and, in fact, I think I'll just use the item number, if that's okay with you.

Q Yeah. That...

A Okay. No. 21 is also specifically identified in the NRC inspection report.

Item 23 is specifically identified in the inspection report.

Item -- Item 22 is specifically identified.

Item 24 is specifically identified.

Item 25 is specifically identified.

Item 26 is specifically identified.

Item 27 is specifically identified.

Item 28 is specifically identified.

Item 30 is specifically identified.

Item 31 is specifically identified.

Item 32 is specifically identified.

Item 33 is specifically identified.

Item 34 is specifically identified.

Item 35 is specifically identified.

Q Just to stop you there, Item 35 is entitled "Unclassified Additions"?

A Correct.

Q Does the NRC report contain more specifics as to

what additions are?

A Curbs and ramps, I believe.

Q What was that? I'm sorry.

A "Install ramps around the auxiliary control panels in one section of the main control board to channel away any flammable fluids and liquids."

Q Okay.

A Item 36 is specifically referenced.

Item 37 is specifically referenced.

Item 40 is specifically referenced.

Item 41 is specifically referenced.

Item 42 is specifically referenced.

Item 43 is specifically referenced.

Item 44 is specifically referenced.

Item 45 is specifically referenced.

And those are the ones specifically referenced in inspection reports.

Q Okay. In any of these inspection report references to projects do the inspection reports include any design specifications with respect to the projects?

A Can you identify what you mean by "design specifications"?

Q Well, the details necessary to implement the project from a perspective as to exactly what is going to be constructed or added.

MS. WONG: Object to the form.
A So, what you're looking for is a document or something that can be handed to someone to build it?
Q Well, just a document specifying any of the details with respect to what the project entails.
A In most cases there is a reference or at least information in the inspection report that identifies what the project entails.
Q Well, let's look at, for example, your Paragraph -- the first one to talk about the switch gear room, Paragraph 20.
A Okay. Right. And in that inspection report the discussion indicates that a total of 22 plant design change records were generated as a result of the new switch gear room addition. It identifies them by name and by number, so, it does provide the specifics as to what needs to be done.
Q I'm sorry. Could you repeat that last statement?
A It provides the specifics as to what needs to be done. The paragraph 3.0 identifies the size of the building, where it will be located, identifies the types of equipment that would be in there, and then following that is an identification of the individual projects that need to be completed in order to complete the project.
Q Do you have the page, the Bates reference numbers

on those pages that you were looking at?

A 17691.

Q Okay. Thanks. Did Connecticut Yankee submit any letters or correspondence to the NRC that identified the specifications and amount of any property that was going to be installed at the Connecticut Yankee plant with respect to the --

A They may have. In some instances, the way a particular project was documented was to put it in an inspection report. In other instances it was a commitment that was made to the Nuclear Regulatory Commission who verbally or otherwise from the resident inspector and they kept a list of the various commitments that the utility was responsible for. That was an internal document to the NRC. So, perhaps, but more than likely it's documented in the NRC inspection reports. Some cases where the -- where the addition is small it may not be referenced.

Q I'm sorry. Just to go back a minute to -- I'm having some trouble finding the document. That -- for the switch gear room document reference number, what was that again?

A 17691.

Q Now, did you review all the capital additions that Connecticut Yankee is claiming in this case?

MS. WONG: Objection to form.

Q (by Mr. Stewart) Do you want me to restate the question?
A No. I'm just thinking to the documents in the case, and I believe I have. And those were the capital additions identified by an answer to an interrogatory, I believe.
Q I'm sorry. You -- could you ---
A There was a listing that was provided in response to an interrogatory that had the capital additions for 1986, '87, '88, '89.
Q You reviewed all those capital additions listed on that chart?
A Correct.
Q Now, going to your Exhibit 4 entitled "Capital ---" Excuse me. "Connecticut Yankee Year End and Committed Capital Projects," could you tell me what are listed on this -- this exhibit then?
A What's listed here are those capital projects that Connecticut Yankee was required to perform and had been committed to prior to the end of 1985.
Q When you say "required to perform" are you talking -- what are you talking about?
A In accordance with the regulations.
Q So, if it's not on this list does that mean that it wasn't required by regulation?

A No, not necessarily. Means that I could not substantiate through the documents that I had that the commitment was made by Connecticut Yankee to executive the project prior to the end of 1985.

Q Going back to Paragraph 52 and 53, I just want to clarify, in 52 you say, "Fuel and capital additions were performed so that Connecticut Yankee could keep its license."

A Right.

Q And in 53 you say, "Capital additions were the result of regulations." Are -- in 52 are you talking about the capital additions that you've listed on Exhibit 4?

A Yes.

Q And does that apply as well to Paragraph 53, the capital additions you reference there?

A Yes.

Q Now, in 52 what about the, when you say, "Fuel additions were performed so that CY could keep its license," what do you mean by that?

A Well, I probably should have said "refueling." In other words, capital additions clearly were performed to meet the license requirements. In order to operate the power plant you need to refuel it, and you -- you refuel it in accordance with the NRC requirements.

Q So ---

A In other words, you can't -- you have to refuel the plant, you cannot continue to operate the plant with the fuel that's in there beyond certain design parameters of the reload fuel. In other words, once you reach the end of full power life for the fuel, the plant starts to reduce power because there's not enough energy left in the fuel, and you reach a point in that reduction where you start to impact on the design parameters established by license by the Nuclear Regulatory Commission; so, therefore, you are required to refuel so that you can continue to operate.

Q Well, just to be clear then, the -- does the NRC -- is there an NRC requirement that requires the refueling of the plant?

A When certain design parameters are approached on the current fuel in the reactor.

Q That's for continued operations.

A Well, yes, but it also means that you have to shut down and potentially you could lose your license if you operate beyond that period. So, the choice is pretty clear. The only choice you have is to refuel.

Q And with respect to Paragraph 54, reference there to capital additions, is that also -- is it also true that you're referencing the capital additions that you've got listed on your Exhibit 4?

A That's correct.

Q Now, did you consult with Mr. Balducci in the preparation of your report?
A No, I did not.
Q Did you consult with him in the preparation of his report?
A I did not.
MR. STEWART: Levina, I think we want to take about a ten-minute break.
MS. WONG: All right. You want to call us back in ten minutes?
MR. STEWART: Call you back.
MS. WONG: Right.
(Recess.)
MS. WONG: We're back on.
Q (by Mr. Stewart) Mr. Dente, I wanted to ask you a question about your chart. In your chart you include a number of projects for 1986 and I'm referring to that.
A The criteria that I used was if it was committed to by the year end 1985 I put it in the chart.
Q And this was something we have talked about with respect to two of the paragraphs at the end of your report but I just wanted to make sure it's clear that throughout your report when you refer to "capital additions" that you're talking about the capital additions listed on Exhibit 4 of your report?

A Correct.
Q And you're not referring to any other capital additions that are involved in this case?
A No.
Q Going back to Paragraph 16 of your report, you say "review of contracts, fuel and the reloads at issue, contracted for or by Connecticut Yankee by year end 1985 and placed in service by 1990," can you tell me when you considered the fuel as in service?
A The fuel is considered in service once it's placed in -- in the reactor.
Q Okay. We touched earlier on some of these other contracts involved in the nuclear free -- excuse me -- nuclear fuel reloads, and I don't want to beat a dead horse because -- based on what you testified before, but do you recall when any of those contracts were executed?
A I believe that the -- I believe that the UF6 for the gas contract was about 1984. I believe that the -- the uranium U308 contract was in the '76, 1976 time frame.
Q That would be the third contract that you referenced?
A Yes. Wait a minute. Let me just make sure. Procurement of uranium No. 1, I believe that was -- that was the 1976 contract.
Q You know how long that contract ran?

A Thirty years, subject to check. I don't have a copy of the contract in front of me, but I believe it was about -- it was many years, multiple years, and it was in effect during this period of time.

Q It didn't provide for a specific delivery of uranium in each year?

A As I recall -- give me one minute.

(Pause.)

No, I don't have anything here that would tell me that specific information. I believe it did identify that there were -- a total amount of uranium that would be -- or U3O8 that would be required, but without looking directly at that contract, which I don't have in front of me at this point, I can't answer your question.

Q Did the contract specifically identify fuel for particular reloads?

A So, you're saying did the contract specifically identify fuel for Reload 15 or 16 or 14?

Q Right.

A Without looking directly at the contract I can't answer that question.

Q Do you recall who that contract for the uranium was with?

A No, I don't.

Q What about the contract for the conversion of

uranium into gas? Was -- do you recall who that was with?

A No, I don't.

Q What about the enrichment contract? Do you know who that was with?

A I believe that was a contract with Euratom, E-u-r-a-t-o-m, I believe.

Q I'm sorry. What was that again?

A I believe it was a contract with Euratom, E-u-r-a-t-o-m. And it almost seems to me that the contract for the concentrates, U3O8, was Freeport, subject to -- subject to check.

MR. STEWART: I think that's all I have, Levina.

(Whereupon, the above matter was concluded at 11:32 a.m.)

//

//

//

//

//

//

//

//

//

//

//

I have read the foregoing pages 187 through 223, and they are a true and accurate record of my testimony therein recorded, and any changes and/or corrections appear on the attached errata sheet signed by me.

____________________________________

THOMAS J. DENTE

Subscribed and sworn to before me

this _____ day of ___________, 2005

____________________________________

Notary Public

My Commission expires: _________________________

CORRECTION SHEET

DEPOSITION OF THOMAS J. DENTE

| PAGE NO. | LINE NO. | SUGGESTED CORRECTION |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS )
) SS.
COUNTY OF SUFFOLK )

I, Marguerite Summers, a Court Reporter and Notary Public, within and for the Commonwealth of Massachusetts, do hereby certify that there came before me on this 8th day of September, 2005, the person hereinbefore named, who was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, concerning and touching the matter in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting, under my direction, and that this deposition transcript is a true and accurate record of the testimony given by the witness.

I further certify that I am not related to any of the parties hereto or their counsel, and that I am in no way interested in the outcome of said cause.

Dated at Boston, Massachusetts, this 22nd day of September, 2005

Marguerite Summers
NOTARY PUBLIC
My Commission Expires:
November 10, 2011