UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, | ) | Fed. Cl. No. 04-0085 T |
| Plaintiff, | ) | Judge Francis M. Allegra |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Steven A. Kaufman
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000
(617) 951-7050 (facsimile)
steven.kaufman@ropesgray.com

Dated: January 31, 2006

Counsel:

J. Steven Baughman
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
(202) 508-4600
(202) 508-4650 (facsimile)
sbaughman@ropesgray.com

A.L. Spitzer
Levina Wong
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000
(617) 951-7050 (facsimile)
lorry.spitzer@ropesgray.com
levina.wong@ropesgray.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ....................1

FACTS ....................1

Connecticut Yankee's Transitional ITC Claim....................4
The Nuclear Fuel....................5
Other Transition Property ....................6

ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT....................7

DISCUSSION OF LEGAL PRINCIPLES ....................7

I. NRC Regulations and Licensing Requirements Applicable to the Operation of the Connecticut Yankee Nuclear Power Plant are "Related Documents" to the Power Contracts ....................7

II. The Nuclear Fuel and Other Property Additions Were "Necessary to Carry Out" and "Readily Identifiable" with the Power Contracts and Related Documents...........10

III. The Nuclear Fuel and Other Property Additions Satisfy Class Life Requirements of the Tax Reform Act of 1986....................14

A. The Nuclear Fuel and Other Property Additions Have a Deemed 20-Year Class Life and Thus Satisfy Rule 1 ....................14

B. The Nuclear Fuel and Other Property Additions Have a Deemed 20-Year Class Life, Were Placed in Service Prior to January 1, 1991, and Thus Satisfy Rule 2 ....................15

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir. 1998)........................................15

*Alvin, Ltd. v. United States Postal Services*, 81 F.2d 152 (Fed. Cir. 1987)....................................8

*Bell Atlantic Corp. v. United States*, 224 F.3d 220 (3d Cir. 2000).........................................12, 13

*FLP Group, Inc. v. Commissioner*, T.C. Memo 2005-208 (2005) ...............................9, 10, 13, 15

*Maine Yankee Atomic Power Co. v. Commissioner*, T.C. Memo 2002-176 (2002).................9, 10

*National Data Corp. v. United States*, 50 Fed. Cl. 24 (2001).......................................................11

*United States v. Commonwealth Energy System and Sub. Cos.*, 235 F.3d 11 (1st Cir. 2000)....................................................................3, 9, 12, 13

*United States v. Kjellstrom*, 916 F. Supp. 902 (W.D. Wis. 1996) .................................................3

### STATUTES

26 U.S.C. § 38 (1985) ...........................................................................................................3

H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol.4) at 60.............................................................7

Tax Reform Act of 1986 § 211, Pub. L. 99-154, 100 Stat. 216......................................................3

Plaintiff Connecticut Yankee Atomic Power Company ("Connecticut Yankee") hereby respectfully submits this Memorandum of Contentions of Fact and Law pursuant to RCFC Appendix A ¶14(a).

**STATEMENT OF THE CASE**

Plaintiff Connecticut Yankee seeks an income tax refund on account of investment tax credits it claims should have been allowed by the IRS for nuclear fuel replacements and capital projects undertaken during the period 1987-1990.

Connecticut Yankee is the owner and operator of a nuclear power plant, the entire output of which was required to be provided to ten New England electric utilities that sponsored construction of the plant. The plant is subject to licensure and other regulatory controls of the Nuclear Regulatory Commission. Distribution of the plant output is governed by the terms of written supply and service contracts.

The specific substantive issue raised in this refund suit is whether plaintiff is entitled to transitional investment tax credits (Transitional ITC) with respect to certain property placed in service in 1987, 1988, 1989, and 1990. The Transitional ITC was available for investments in property that was placed in service before January 1, 1991, and was readily identifiable with and necessary for the purpose of carrying out written supply or service contracts that were entered into prior to 1985 and were binding as of December 31, 1985. The basic issue in this action is whether the plaintiff's purchase of nuclear fuel and other property used in the generation of electricity by a nuclear power plant was eligible for the Transitional ITC.

**FACTS**

The following are facts Plaintiff expects to be stipulated by the Parties or proved through the admission of documents or the testimony of competent witnesses at trial:

Connecticut Yankee is the owner of a nuclear power plant (the "Plant") that began operation on January 1, 1968. The operation of the Plant is governed by a power contract that Connecticut Yankee originally entered into in 1964 (as amended and supplemented, the "Power Contract"), pursuant to which Connecticut Yankee agreed to sell 100% of the electric output of the Plant to ten New England electric utilities (the "Sponsors") over an original term of 30-years, the original expected life of the Plant. Also pursuant to the Power Contract, Connecticut Yankee was obligated to "operate and maintain the Unit in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954 and of any license issued thereunder to Connecticut Yankee." The Power contract also provided that "outages for inspection, maintenance, refueling and repairs and replacements will be scheduled in accordance with good utility practice."

To carry out the Power Contract (i.e., to produce nuclear energy and to retain its license to operate), it was necessary for Connecticut Yankee to "load" and "reload" nuclear fuel into the Plant and make certain other property additions in compliance with federal regulations. Throughout the years, Connecticut Yankee and its Sponsors amended and supplemented the Power Contract, acknowledging changes in law and incorporating by reference any subsequent changes in law. For example, Connecticut Yankee and its Sponsors executed an Additional Power Contract, dated April 30, 1984, that re-stated Connecticut Yankee's obligation to "operate and maintain the Unit in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Act and of any license issued thereunder to Connecticut Yankee," where the "Act" was defined as "the Atomic Energy Act of 1954, *as amended from time to time*" (emphasis added).

From the date of the original Power Contract though year-end 1985, the Atomic Energy Act of 1954 and the operating license issued to Connecticut Yankee were both "amended from time to time," as contemplated by Connecticut Yankee and its Sponsors. In the case of the Atomic Energy Act of 1954, it was amended to create, *inter alia*, the Nuclear Regulatory Commission ("NRC"). The NRC regularly inspected Connecticut Yankee and, in the case of the operating license issued to Connecticut Yankee, the NRC regularly amended the operating license to reflect refueling outages and other capital projects that were required for Connecticut Yankee to keep its license.

The investment tax credit ("ITC") was originally enacted in 1962 to provide tax incentives for capital investment. *See* 26 U.S.C. § 38 (1985). Under the ITC, a taxpayer could offset its tax liability for the year it placed qualifying property in service, in an amount equal to a portion of the cost of such property. As part of the Tax Reform Act of 1986 (the "Act"), Congress repealed the ITC for most taxpayers, effective for property placed in service after December 31, 1985. Tax Reform Act of 1986 § 211, Pub. L. 99-154, 100 Stat. 216. Congress recognized, however, that an immediate repeal would cause a significant disruption for many businesses that had assumed its continued existence in planning their affairs, and, accordingly, included a number of exceptions that permitted such taxpayers to continue benefiting from the ITC for certain transitional periods. *See* the Act §§ 203-04; *United States v. Commonwealth Energy Sys. and Sub. Cos.*, 235 F.3d 11, 17 (1st Cir. 2000) (citing *United States v. Kjellstrom*, 916 F. Supp. 902, 905 (W.D. Wis. 1996)).

Indeed, prior to 1986, Connecticut Yankee had developed a strong reliance interest in the continued existence of the ITC. From its commencement of operations in 1968, Connecticut Yankee claimed the ITC for nuclear fuel loads and reloads as well as other qualifying property

additions for every eligible year. Connecticut Yankee's assumption that it would continue to receive the ITC for such property additions figured prominently in its financial forecasting, budgeting, and planning.

The repeal of the ITC in 1986, then, represented a significant disruption for Connecticut Yankee. Because Connecticut Yankee reasonably relied on the continued existence of the ITC, and continued to place qualifying property in service through 1990 under the terms of the Power Contract, it fell within the class of taxpayers to whom Congress intended to grant transitional relief from the immediate repeal of the ITC.

***Connecticut Yankee's Transitional ITC Claim***

Connecticut Yankee timely filed claims for refunds for the tax years 1987, 1988, 1989, and 1990, claiming, *inter alia*, Transitional ITC totaling to $11,767,080 related to the 1987, 1988, 1989, and 1990 qualified property additions. Connecticut Yankee's informal claims for refund for ITC transition property are reflected in a "30-day letter" issued by the IRS. As stated in the "30-day letter," the tax basis for fuel for which Connecticut Yankee claims Transitional ITC totaled $89,589,066 and the tax basis for non-fuel capital additions for which Connecticut Yankee claims Transitional ITC totaled $91,466,194.

The IRS denied Connecticut Yankee's refund claims for tax years 1987, 1988, 1989, and 1990. Connecticut Yankee appealed the denial of the Transitional ITC to the IRS Appeals Office, which denied Connecticut Yankee's appeal for refund claims. On January 25, 2002, Plaintiff filed with the IRS Form 2297, "Waiver of Statutory Notice of Claim Disallowance," covering tax years 1987, 1988, 1989, and 1990, reserving its right to pursue its claim for refund of the Transitional ITC in the amount of $11,767,080. Connecticut Yankee subsequently commenced this action.

***The Nuclear Fuel***

Connecticut Yankee's refund claim is, in part, attributable to monies spent on nuclear fuel in the 1988 and 1990 tax years.[1]

The process of converting raw uranium into fuel for a nuclear power plant consists of four steps (mining the uranium from the ground; converting it into a gas; enriching it to increase the amount of radio active isotope; and "fabricating" it into ceramic pellets, placing the pellets into stainless steel tubes, and arranging the tubes into a specific geometric array). The laborious process of converting raw uranium into fuel assemblies meant that, for each of the four steps involved in procuring nuclear fuel, Connecticut Yankee entered into four separate contracts years in advance of a fuel reload. For the two fuel reloads at issue in this case, Connecticut Yankee had entered into a contract with the U.S. Atomic Energy Commission, dated February 26, 1974, for the enrichment of the uranium. The contract for the fabrication of the two fuel reloads at issue in this case was between Connecticut Yankee and Babcock and Wilcox ("B&W"), dated December 21, 1984.

The nuclear power plant at Connecticut Yankee was on an 18-month reloading schedule where one-third of the fuel assemblies in the reactor were replaced approximately every 18-months. As a licensee, Connecticut Yankee was obligated by the NRC to submit technical specifications in advance of each fuel reload in order to obtain an amendment to its license.

[1] Due to a scrivener's error, the tax bases for the two nuclear fuel reloads at issue fall into the wrong columns. That is, the tax basis of $43,279,849 that is listed under year 1987 on Exhibit CTY_0040 at 66 should correctly be listed under year 1988, and the tax basis of $46,390,217 that is listed under year 1988 on Exhibit CTY_0040 at 66 should correctly be listed under year 1990.

From July 18, 1987 to March 26, 1988, Connecticut Yankee shut down its Plant to reload the reactor with fuel "Cycle 15," also referred to as "Reload 14." The tax basis for Cycle15/Reload 14 was $43,279,849.

From September 2, 1989 to August 15, 1990, Connecticut Yankee shut down its Plant to reload the reactor with fuel "Cycle 16," also referred to as "Reload 15." The tax basis for Cycle 16/Reload 15 was $46,390,217.

***Other Transition Property***

The remainder of Connecticut Yankee's refund claim is attributable to amounts spent on capital additions that were required by the NRC in order for Connecticut Yankee to retain its operating license, which was necessary for Connecticut Yankee to perform under the Power Contract.

Throughout the years, the NRC imposed new standards and regulations on nuclear power plants, standards and regulations with which Connecticut Yankee was required to comply in order to retain its operating license. In order to ensure that the plants were adhering to the new standards and regulations, the NRC regularly performed inspections of the nuclear power plants and imposed deadlines for the work to be done. Connecticut Yankee expects to show at trial that these non-fuel capital additions were done as a result of an NRC regulation or order where the specifications and amount of the property were readily ascertainable by year-end 1985.

The tax basis for these capital additions are reflected in the FERC Form 1 filed by Connecticut Yankee for the tax years at issue and appear on Connecticut Yankee's informal claim as totaling $91,466,194.

## ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

The relevant issues of fact and law to be resolved by the Court are:

I. Whether NRC regulations and licensure requirements applicable to the operation of the Connecticut Yankee nuclear power plant are "related documents" to the Power Contracts, which Power Contracts expressly require operation of the plant "in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954 and of any license issued thereunder."

II. Whether the nuclear fuel and other property additions were "necessary to carry out" and "readily identifiable" with the Power Contracts and related documents.

III. Whether the nuclear fuel and other property additions satisfy class life requirements of the Tax Reform Act of 1986.

## DISCUSSION OF LEGAL PRINCIPLES

I. <u>NRC regulations and licensing requirements applicable to the operation of the Connecticut Yankee nuclear power plant are "related documents" to the Power Contracts.</u>

*Plaintiff's Legal Position*

The Conference Committee Report states that the Transitional ITC "is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, *or from related documents*." H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol.4) at 60 (emphasis supplied).

As a general rule of law, if the language of a contract clearly indicates that it was the intention of the parties to include changes in law subsequent to the execution of a contract, then the changes are deemed part of the contract. *See* 11 Williston on Contracts § 30.23 (4th Ed.).

*Cf. Alvin, Ltd. v. United States Postal Services*, 81 F.2d 152, 156 (Fed. Cir. 1987) (finding that Postal Service could not incorporate subsequent change in law where there was "no evidence of contemporaneous recognition that such dramatic change … was a reasonable possibility"). The Power Contract expressly requires operation of the plant "in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954 and of any license issued thereunder." The Additional Power Contract executed by the parties reaffirm that obligation and incorporate subsequent changes to the Atomic Energy Act of 1954 "*as amended from time to time*" (emphasis added). Therefore, it was the intention of the parties to the Power Contract to incorporate the subsequent changes to the Atomic Energy Act of 1954, which included the formation of the NRC and the promulgation of regulations by the NRC.

In particular, the Power Contract required that Connecticut Yankee operate and maintain the Plant "in accordance with" the "applicable provisions" of "any license" issued by NRC. The NRC license – together with any filings by Connecticut Yankee with NRC required under the license – were accordingly "related documents" to the Power Contract. Indeed, the record will show that, with respect to every nuclear fuel load or reload and property addition for which Connecticut Yankee is claiming Transitional ITC, specifications were sent to and approved by NRC, as required by the terms of the NRC operating license. Such specifications constituted "related documents" to the Power Contract that set forth the "specifications and amount" of the nuclear fuel and property additions.

Moreover, the Power Contract required that Connecticut Yankee "operate and maintain" the Plant "in accordance with good utility practice." To "operate and maintain" the Plant, the Plant had to be periodically shut down for refueling and repairs. The documents prepared by

Connecticut Yankee in connection with such activities, therefore, represent "related documents" to the Power Contract. The record will show that such "related documents" included fuel reload and repair schedules that provided the "specifications and amount" of the nuclear fuel and other property additions.

*Defendant's Anticipated Legal Position and Plaintiff's Response*

Defendant's anticipated legal position with respect to whether NRC regulations and licensing requirements are "related documents" is a position in line with the courts' distinguishable rulings in *Commonwealth Energy*, 235 F. 3d 11; *Maine Yankee Atomic Power Co. v. Comm'r*, T.C. Memo 2002-176 (2002) and *FLP Group, Inc. v. Comm'r*, T.C. Memo 2005-208 (2005). In rebuttal, Connecticut Yankee states that the rulings of the First Circuit in *Commonwealth Energy*, the Tax Court in *Maine Yankee*, and the Tax Court in *FLP*, have no bearing on the issue whether, in Connecticut Yankee's case, the ancillary documents prepared by Connecticut Yankee are "related documents" to the Power Contract that provide the "specifications and amount" of the nuclear fuel and other property additions.

The taxpayer's situation in *Commonwealth Energy* was substantially different than Connecticut Yankee's situation. The taxpayer introduced no "related documents" into evidence, and the court ruled that the taxpayer "could not determine what (if any) replacement property it would need in the future." By contrast, in Connecticut Yankee's case, NRC regulations, inspection reports and contract amendments specifically describe the items of work for which the ITC is claimed.

In *Maine Yankee*, the Tax Court ruled that the operating license and amendments and appendices thereto were not "related documents" to the power contracts, because they were not "incorporate[d]" into the power contracts and were not prepared "contemporaneously" with the

power contracts. In Connecticut Yankee's case, as indicated above, the NRC regulations asserted to be related documents to the Power Contract were incorporated into the Power Contract, and the Power Contract expressly required compliance with the operating license as amended. Besides, the Tax Court, applied the wrong test: the test set out in the Conference Committee Report is not whether the documents said to have been related to the service or supply contract are "incorporate[d]" into the contract or prepared "contemporaneously" with the contract, but rather whether they are "related" to the contract, a different standard. In view of this error, and the fact that Connecticut Yankee's "related documents" were incorporated into the Power Contracts the decision of the *Maine Yankee* court is of no relevance to Connecticut Yankee's claim.

In *FLP*, the Tax Court disposed of the case by first deciding that the tariff at issue was not a service or supply contract as contemplated by the Act. All else is dicta. Moreover, the superfluous dicta was in any event simply a recapitulation of the Tax Court's erroneous reasoning in *Maine Yankee*.

II. The nuclear fuel and other property additions were "necessary to carry out" and "readily identifiable" with the Power Contracts and related documents.

*Plaintiff's Legal Position*

The Parties have stipulated that the nuclear fuel and other property additions were "necessary to carry out" the Power Contract.

The nuclear fuel and other property additions placed in service by Connecticut Yankee between 1987 and 1990 were "readily identifiable with" the Power Contract even though not specifically described in the Power Contract because they were specified by NRC regulations and other materials that constituted "related documents" to the Power Contract. The statutory language itself supports this conclusion. The natural meaning of the words "readily identifiable

with" can encompass property that is associated with a given contract by virtue of related materials even if the technical details of the property are not specifically set forth in the contract itself. For example, in Connecticut Yankee's case, the Power Contract – the single contract that governed, or overarched, all of Connecticut Yankee's operations – required Connecticut Yankee to generate nuclear energy, and the generation of nuclear energy obviously requires nuclear fuel. The nuclear power industry is highly regulated, and every acquisition of nuclear fuel by Connecticut Yankee was planned years in advance and was made under the specific authority of the Power Contract. Nuclear fuel is therefore "readily identifiable with" the Power Contract, based on the natural meaning of the phrase.

The legislative history of the ITC repeal also supports the conclusion that nuclear fuel and other property additions need not be specifically described in the Power Contract to be "readily identifiable with" the Power Contract. The Conference Committee Report on the Act provides that the "readily identifiable" test is satisfied "only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents." The meaning of this "specifications and amount" test was addressed in a colloquy[2] between Senators Long, Packwood, and Matsunaga on the Senate floor, in which Senator Matsunaga stated:

> I would like to ask the bill managers to clarify another point. The supply or service contract transition rule requires that the property be readily identifiable with and necessary to carry out the contract. The committee report explains that the specifications and the amount of the property must be readily ascertainable from the terms of the contract or from related documents.
>
> Is this Senator's understanding correct that the requirement is met when a binding power purchase contract specifies the type of generating equipment in terms of

[2] Notably, in *Nat'l Data Corp. v. United States*, 50 Fed. Cl. 24, 32 n.14 (2001), Judge Allegra himself determined that certain statements from the floor of Congress concerning a taxpayer's entitlement to Transitional ITC were an "accurate gauge of Congressional intent."

> primary energy source and specifies the amount of generating equipment in terms of total generating capacity of the turbines necessary to produce the contracted power? In other words, the rule does not require the technical details of the generating property to be spelled out.

(Emphasis added.) Both Senators Packwood and Long indicated that Senator Matsunaga was correct.

This colloquy indicates, very reasonably, that Congress did not intend for the statute to require that the "technical details" of eligible property be "spelled out" in the Power Contract. Moreover, the colloquy establishes that, in Connecticut Yankee's case, the "specifications and amount" test – and in turn the "readily identifiable" test – is satisfied by the fact that the Power Contract indicates the primary energy source (nuclear fuel) and the total generating capacity of the Plant (490 megawatts).

*Defendant's Anticipated Legal Position and Plaintiff's Response*

It is anticipated that Defendant's legal position is that of the defendant in *Commonwealth Energy*, 235 F.3d at 16-17; *FLP*, T.C. Memo 2005-208 at 35; and *Bell Atlantic Corp. v. United States*, 224 F. 3d 220, 223-226 (3d Cir. 2000). In rebuttal, Connecticut Yankee states that the circumstances of *Commonwealth Energy Sys.*, 235 F.3d 11 (1st Cir. 2000) were different in critical respects from the circumstances here: There, there was nothing comparable to NRC regulation, NRC operating license or NRC inspection report in which the property at issue – turbine generators – were identified and required; here, by contrast, the fuel replacements and other capital projects were identified in and required by those related documents. Further, the *Commonwealth Energy* court was not presented with a situation in which, as here, the taxpayer was operating a nuclear plant under a single power contract that provides the primary energy source and total generating capacity of the Plant, and whose fuel reloads and equipment additions are planned and approved by the government years in advance. Any purchase of

power-generating fuel and equipment for the Plant made by Connecticut Yankee would be "readily identifiable with" the Power Contract; however, such property would not necessarily be "necessary" to carry out the Power Contract. If Connecticut Yankee purchased more nuclear fuel than it actually needed to carry out the Power Contract, for example, such property would be "readily identifiable with" the Power Contract but not "necessary" to carry out the Power Contract. Accordingly, the *Commonwealth Energy* reasoning as applied here was incorrect: "readily identifiable" and "necessary" have distinct meanings in Connecticut Yankee's situation.

Likewise, the analysis in *Bell Atlantic*, 224 F.3d at 223-226, is inapposite. The Third Circuit concluded that internally generated estimates could not be used to show that property is "readily identifiable with" a written service contract because the internal estimates "were not prepared contemporaneously with the contract…, had no binding effect on anyone, and … were not provided to the other contracting party." *Id.* at 225. The case at hand differs in two material ways. First, rather than relying on internal estimates, Connecticut Yankee relies on actual specifications and contracts for fuel and NRC requirements. Second, the specifications and contracts for fuel and NRC requirements were binding obligations of Connecticut Yankee as of year-end 1985. Connecticut Yankee was contractually obligated to spend those monies for those specific items of work by year-end 1985.

As noted above, the court in *FLP* disposed of the case on the issue whether the tariff was a service or supply contract, and its additional discussions were dicta.

In sum, even though the nuclear fuel and other property additions were not specifically described in the Power Contract, they were still "readily identifiable with" the Power Contract based on the clear association between the Power Contract and the property additions, as well as

the references in the Power Contract to the primary energy source and total generating capacity of the Plant.

III. The nuclear fuel and other property additions satisfy class life requirements of the Tax Reform Act of 1986.

*Plaintiff's Legal Position*

For Connecticut Yankee's nuclear fuel and other property additions to qualify for Transitional ITC, they must also satisfy the following two rules set forth in subparagraph A of Section 203(b)(2) of the Act.[3] First, the property must have a class life of at least 7 years (referred to herein as "Rule 1"). Second, if the class life is 20 years or more, the property must have been placed in service on or before January 1, 1991 (referred to herein as "Rule 2"). For the reasons that follow, both Rules 1 and 2 are satisfied in this case.

***A. The Nuclear Fuel and Other Property Additions Have a Deemed 20-Year Class Life and Thus Satisfy Rule 1.***

Rule 1 requires that property have a minimum class life of 7 years. Although the nuclear fuel and some of the property additions have a class life of less than seven years for most tax purposes, Rule 1 is subject to Section 203(b)(2)(C) of the Act, which provides that "[f]or purposes of subparagraph A [which includes both Rules 1 and 2] . . . property described in section 204(a) shall be treated as having a class life of 20 years." One of the types of property described in section 204(a) (specifically, in section 204(a)(3)) is property which is "readily identifiable with and necessary to carry out a written supply or service contract . . . which was binding on December 31, 1985." For the reasons set forth above, the nuclear fuel and other property additions for which Connecticut Yankee is claiming Transitional ITC meet this

3 For the Court's reference, the relevant statutory language is attached hereto as Appendix A.

standard. Accordingly, such property has a deemed class life of 20 years, which satisfies Rule 1's requirement of a minimum class life of 7 years.

### *B. The Nuclear Fuel and Other Property Additions Have a Deemed 20-Year Class Life, Were Placed in Service Prior to January 1, 1991, and Thus Satisfy Rule 2.*

Rule 2 requires that property with a class life of 20 years or more have been placed in service by January 1, 1991. Connecticut Yankee's nuclear fuel and other property additions have a deemed class life of 20 years for purposes of Rule 2 for exactly the same reasons as for Rule 1. Namely, they fall within the special rule of section 203(b)(2)(C) of the Act, quoted above. Because all of the property for which Connecticut Yankee is claiming Transitional ITC was placed in service on or before January 1, 1991, such property satisfies Rule 2.

*Defendant's Anticipated Legal Position and Plaintiff's Response*

It is anticipated that Defendant's legal position will be the same as the defendant in *Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir. 1998), where the 9th Circuit reversed the district court and held that certain property was deemed to have a 20-year class life under section 203(b)(2)(C) only for purposes of Rule 2, but not for Rule 1. The court's holding was based largely on its view that the application of the deemed 20-year life provision to both Rules 1 and 2 would read Rule 1 out of the statute. That is, the court thought that if all property described in section 204(a) was deemed to have a 20-year class life for purposes of both Rules 1 and 2, the requirement of Rule 1 – that property have a class life of at least 7 years – would always be satisfied and would therefore cease to have any significance.[4]

In rebuttal, Connecticut Yankee states that the holding in *Airborne Freight* is belied by the plain language of section 203(b)(2)(C), which makes *absolutely no distinction* between Rules

---

[4] The Tax Court in *FLP* adopted the *Airborne* court's reasoning in its dicta regarding the 'class life' issue. T.C. Memo. 2005-208 at 40-41.

1 and 2 in providing that property described in section 204(a) has a 20-year deemed class life for purposes of subparagraph (A) of section 203(b)(2) (the subparagraph that includes both Rules 1 and 2). Moreover, the application of the deemed 20-year life provision to both Rules 1 and 2 would *not* negate Rule 1 as the 9th Circuit had thought, and hence there was no need to do violence to the plain language of section 203(b)(2)(C). By their terms, Rules 1 and 2 apply both to property described in section 204(a) as well as property described in section 203(b)(1). To be sure, the application of the 20-year deemed class life provision to both Rules 1 and 2 would result in Rule 1 being satisfied in every case with respect to property described in section 204(a). However, Rule 1 would *not* be satisfied in every case *with respect to property described in section 203(b)(1)*. By way of illustration, property described in section 203(b)(1) includes, among other things, property "constructed, reconstructed or acquired by the taxpayer pursuant to a written contract that was binding on March 1, 1986" (the "constructed or acquired property prong"). If a taxpayer had acquired property with a class life of less than 7 years (certain computers, for example, have a class life of 6 years) pursuant to such a contract, such property--which is *not* deemed by section 203(b)(2)(C) to have a class life of 20 years—would fail Rule 1 and would not qualify for Transitional ITC under the constructed or acquired property prong. Thus, the 9th Circuit's principal rationale underlying the Airborne Freight decision was simply incorrect: the application of the 20-year deemed class life provision to both Rules 1 and 2, a reading that flows naturally from the statute, would *not* render Rule 1 meaningless.

The 9th Circuit compounded its error when it stated that section 211(a) of the Act (which enacted section 49 of the Internal Revenue Code) provided support for its interpretation of the 20 year deemed class life rule of section 203(b)(2)(C) of the Act. Code section 49(e)(1) (as enacted by section 211(a) of the Act) defined "transition property" – that is, property potentially eligible

for Transitional ITC – as including property with a class life of less than 5 years, and at least 5 years but less than 7 years, so long as such property was placed in service before July 1, 1986 and January 1, 1987, respectively.

The 9th Circuit indicated that the "most reasonable reading of this subsection is that it renders additional property eligible for the investment credit, and for practical purposes adds it to the table of class lives and service dates contained in § 203(b)(2)." In this respect, the 9th Circuit was correct: this portion of section 211(a) indeed made Transitional ITC available to certain property with class lives of less than seven years that satisfied the specified placed-in-service date requirements. The 9th Circuit further indicated that if the district court's interpretation (i.e., the interpretation of Rules 1 and 2 that Connecticut Yankee is here urging) were accepted, "it would give all § 204(a) property a life of 20 years and entirely negate the above provisions of section 49(e)(1)(C)" Although the 9th Circuit was correct that under the district court's and Connecticut Yankee's position all section 204(a) property would have a class life of 20 years, it was again *incorrect* that such an interpretation would "entirely negate the above provisions of section 49(e)(1)(C)." Even though (consistent with Connecticut Yankee's position) section 49(e)(1)(C) may have no application to property described in section 204(a) on account of the 20-year deemed class life rule, section 49(e)(1)(C) would *still be applicable* with respect to property described in section 203(b)(1), which as indicated above includes property "constructed, reconstructed or acquired by the taxpayer pursuant to a written contract that was binding on March 1, 1986." Connecticut Yankee's position therefore does not render section 49(e)(1)(C) meaningless, and the 9th Circuit erred in relying on section 49(e)(1)(C) as support for its interpretation of section 203(b)(2)(C).

**WITNESSES AND EXHIBITS**

In accordance with RCFC Appendix A ¶14(a)(3), Plaintiff is filing a separate motion containing objections to a witness or exhibit listed under RCFC Appendix A ¶13. Pursuant to the Court's wishes as expressed at the Status Conference of October 28, 2005, Plaintiff will renew its Motion to Exclude Portions of the Testimony of James P. McGaughy, Jr. after Defendant's pre-trial submissions are filed on February 28, 2006.

Respectfully submitted,

CONNECTICUT YANKEE ATOMIC POWER COMPANY

By its attorneys,

/s/ Steven A. Kaufman

Steven A. Kaufman
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000
(617) 951-7050 (facsimile)
steven.kaufman@ropesgray.com

Dated: January 31, 2006

Counsel:

J. Steven Baughman
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
(202) 508-4600
(202) 508-4650 (facsimile)
sbaughman@ropesgray.com

A.L. Spitzer
Levina Wong
Ropes & Gray LLP
One International Place
Boston, MA 02110
(617) 951-7000
(617) 951-7050 (facsimile)
lorry.spitzer@ropesgray.com
levina.wong@ropesgray.com