No. 04-0085 T
(Judge Francis M. Allegra)

---

***IN THE UNITED STATES COURT OF FEDERAL CLAIMS***

CONNECTICUT YANKEE ATOMIC POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
G. ROBSON STEWART
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6493

**Page**

## TABLE OF CONTENTS

Introduction . . . . . 1

Statement of the Issue . . . . . 2

Contentions of Fact . . . . . 2

Contention of Law . . . . . 4

A. Statutory Background . . . . . 4

B. The transition rules of the Tax Reform Act of 1986, as special exemptions from tax, are to be narrowly construed . . . . . 7

C. The property at issue was not “readily identifiable with” Connecticut Yankee’s power supply contract or related documents . . . . . 9

D. Plaintiff cannot substantiate the specifications and amount of property for which ITC is sought . . . . . 16

E. Connecticut Yankee’s reliance on a senatorial colloquy to support its broad interpretation is misplaced . . . . . 18

F. Connecticut Yankee’s alleged reliance interest will not be defeated by disallowance of the credit . . . . . 22

G. ITC is not allowable under the transitional rule for plaintiff’s nuclear fuel and other property additions because they have a class life of less than seven years . . . . . 22

Conclusion . . . . . 28

**Page**

## TABLE OF AUTHORITIES

**Cases:**

*Airborne Freight Corp. v. United States*, 153 F.3d 967 (9th Cir. 1998) . . . . . . . . . . 25, 27

*American Airlines, Inc. v. United States*, 204 F.3d 1103 (Fed. Cir. 2000) . . . . . . . . . . . . 1

*Apache Bend Apts., Ltd. v. United States*, 987 F.2d 1174 (5th Cir. 1992) . . . . . . . . . . . . 8

*Bath Iron Works v. Director Office of Workers' Comp.*, 136 F.3d 34 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Beecham v. United States*, 511 U.S. 368 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bell Atlantic Corp. v. United States*, 224 F.3d 220 (3rd Cir. 2000) . . . . . . . . . . . . . . . . . 15

*Burnet v. Houston*, 283 U.S. 223 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Estate of Bell v. Commissioner*, 928 F.2d 901 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 8

*Chandler v. Roudebush*, 425 U.S. 840 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Danville Plywood Corp. v. United States*, 899 F.2d 3 (Fed. Cir. 1990), *aff'g* 16 Cl. Ct. 584 (Cl. Ct. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Department of Air Force v. Rose*, 425 U.S. 352 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 20

*FLP v. Commissioner*, 90 T.C.M. (CCH) 202 (2005) . . . . . . . . . . . . . . . . . . . . . . 9, 12-13

*Helvering v. Northwest Steel Rolling Mills*, 311 U.S. 46 (1940) . . . . . . . . . . . . . . . . . . . 8

*Jupiter Corp. v. United States*, 2 Cl. Ct. 58, 71 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*L.W. Hardy v. United States*, 1 Cl. Ct. at 470-71 . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Liddy v. Commissioner*, 808 F.2d 312 (4th 1986), *reh'g denied*, 815 F.2d 1007 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Maine Yankee Atomic Power Co. v. Commissioner*, 84 T.C.M. (CCH) 73 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12-15

**Page**

**(Continuation):**

*McCarthy v. Bronson*, 500 U.S. 136 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Moorhead v. United States*, 774 F.2d 936 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Norfolk Southern Corp. v. Commissioner*, 140 F.3d 240 (4th Cir.), *cert. denied*, 525 U.S. 1000 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Planned Parenthood Federation v. Heckler*, 712 F.2d 650 (D.C. Cir. 1983) . . . . . . . . . 18

*Public Citizen v. Department of Justice*, 491 U.S. 440 (1989) . . . . . . . . . . . . . . . . . . . . 18

*RTC v. Gallagher*, 10 F.3d 416 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Regan v. Wald*, 468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir.), *cert. denied*, 513 U.S. 919 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19

*Rosenberg v. United States*, 3 Cl. Ct. 432 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sartin v. United States*, 5 Cl. Ct. 172 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16

*Smith v. United States*, 508 U.S. 223 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Thornburg v. Gingles*, 478 U.S. 30 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Automobile Workers*, 352 U.S. 567 (1957) . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Commonwealth Energy System*, 235 F.3d 11 (1st Cir. 2000) . . . 8, 10, 22

**Page**

**(Continuation):**

*United States v. Janis*, 428 U.S. 433 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Kjellstrom*, 916 F. Supp. 902 (W.D. Wisc. 1996), *aff'd*,
100 F.3d 482 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 10, 25-27

*United States v. Menasche*, 348 U.S. 528 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Zeigler Coal Holding Co.*, 934 F. Supp. 292 (S.D. Ill. 1996) . . . . . . . . 13

*Welch v. Helvering*, 290 U.S. 111 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statutes:**

Act of November 8, 1966, Pub. L. No. 89-800, 80 Stat. 1508 (1)(a) . . . . . . . . . . . . . . . . 4

Act of June 13, 1967, Pub. L. No. 90-26, 81 Stat. 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Internal Revenue Code of 1986 (26 U.S.C.):

§ 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23, 24, 26, 27
§ 168 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Revenue Act of 1971, Pub. L. No. 92-178, 85 Stat. 497, 498 (101)(a) . . . . . . . . . . . . . . . 4

Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 487, 660 (703)(a) . . . . . . . . . . . . 4

The Tax Reform Act of 1986 , Pub. L. No. 99-514, 100 Stat. 2166 . . . . . . . . . . . 5, 20, 23

The Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2166:

§ 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 23
§ 203 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*
§ 204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*
§ 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Page**

**Miscellaneous:**

H.R. Conf. Rep. No. 99-841 (1986), reprinted in 1986-3 C.B. (vol. 4) . . . . . . . . . . 6, 24, 27

Rev. Proc. 87-56, 1987-2 C.B. 674, 676 . . . . . . . . . . 25

Treas. Reg. § 1.6001-1(a) (26 C.F.R.) . . . . . . . . . . 2

K. Davis, *Administrative Law Treatise* § 3A.31, p. 175 (1970 Supp.) . . . . . . . . . . 20

James S. Eustice et al., *The Tax Reform Act of 1986: Analysis and Commentary* p. 1-7 n. 26 (1987) . . . . . . . . . . 5, 20

1 Jacob Mertens, Jr., *The Law of Federal Income Taxation* § 3:21 (1999) . . . . . . . . . . 18

Robert E. Rosacker & Richard W. Metcalf, United States Federal Tax Policy *Surrounding the Investment Tax Credit: A Review of Legislative Intent and Empirical Research Findings over Thirty Years (1962-1991)*, 9 Akron Tax J. 59 (1992) . . . . . . . . . . 4

Jack Teuber, *Colloquies: What They Are and What They Do*, 33 Tax Notes 128 (Oct. 13, 1986) . . . . . . . . . . 20

*Edward Yorio, Equity, Efficiency, and the Tax Reform Act of 1986*, 55 Fordham L. Rev. 395, 434 (1987) . . . . . . . . . . 5

*Webster's New Collegiate Dictionary 954* (1981) . . . . . . . . . . 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 04-0085 T
(Judge Francis M. Allegra)

CONNECTICUT YANKEE ATOMIC POWER COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to the Court's Order of November 8, 2005, defendant submits the following memorandum of contentions of fact and law.

## INTRODUCTION

At its core, this case presents the simple issue of whether plaintiff can establish that it is entitled to investment tax credit (ITC) for certain property it claims was placed in service during the 1987-1990 tax years. It is axiomatic that in a tax refund suit, the burden of proof-- including both the burden of persuasion and the burden of going forward--rests with plaintiff. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *United States v. Janis*, 428 U.S. 433, 440 (1976); *American Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed. Cir. 2000); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7 (Fed. Cir. 1990), *aff'g* 16 Cl. Ct. 584, 593-594 (Cl. Ct. 1989). When claiming an alleged overpayment of taxes based on investment tax credits, the taxpayer bears the burden of establishing both the date the property was "placed in service"

as well as "the amount of the credit claimed." *Sartin v. United States*, 5 Cl.Ct. 172, 179 (1984). Moreover, plaintiff is required to maintain records sufficient to substantiate the amounts for which it claims investment tax credits. § 6001; Treas. Reg. § 1.6001-1(a). The ITC transition rules at issue in this case provide specific substantiation requirements, and it will be evident at trial that plaintiff cannot satisfy those substantiation requirements.

## STATEMENT OF THE ISSUE

The Tax Reform Act of 1986 repealed the investment tax credit, but § 204(a)(3) of the Act continued to allow the credit for property that was “readily identifiable with and necessary to carry out a written supply or service contract” that was binding as of December 31, 1985. In 1964, Connecticut Yankee entered into a contract that required it to supply power from its nuclear plant to several utilities. This case presents the question whether plaintiff can establish that it is entitled to investment tax credit for property which it claims was placed in service in connection with refueling, repairs, and improvements of that plant in 1987 through 1990.

## CONTENTIONS OF FACT

Plaintiff owns a nuclear power plant which began operations in 1968. Plaintiff operated the plant pursuant to a power supply contract executed in 1964, which was amended over the years, with the last relevant amendment having been executed on April 30, 1984. In the course of operating the plant, plaintiff installed replacement nuclear fuel in 1988 and 1990. Plaintiff also made various capital additions to the plant during the years 1987-1990.[1]

---

[1] While defendant is not specifically contesting whether the nuclear fuel and property additions were “necessary to carry out” plaintiff’s power supply, defendant has not stipulated that they were necessary, contrary to plaintiff’s assertion on page 10 of its brief.

Plaintiff contends that it is entitled to ITC on the replacement nuclear fuel and capital additions under the relevant ITC transition rules. As will be explained in detail below, the ITC transition rules relating to supply contracts require that the specifications and amount of the property for which ITC is claimed are readily ascertainable from the terms of a supply contract (or related documents) that was entered into before 1985 and was binding as of December 31, 1985. There is no doubt that the terms of the power supply contract at issue here do not contain the specifications or amounts for any of the fuel or non-fuel property for which plaintiff is seeking credit.

Plaintiff, however, asserts that such specifications and amounts of property may be ascertained from documents related to the power supply contract. For example, plaintiff alleges that a contract entered into on February 26, 1974, for the enrichment of uranium is "related" to the power supply contract–even though it is not referenced in the power supply contract and was executed six years after the power contract. (Pl. Br. 5.) Similarly, plaintiff asserts that a fuel fabrication contract executed on December 21, 1984, is "related" to the power supply contract–even though it is not referenced in the last relevant amendment to the power supply contract, which was executed almost nine months before, on April 30, 1984. (Pl. Br. 5.)

In addition, plaintiff asserts that its non-fuel additions were installed pursuant to Nuclear Regulatory Commission (NRC) regulations or orders and that such regulations, orders, submissions to the NRC, and NRC inspection reports are "related documents" which contain the requisite specifications and amount of property. (Pl. Br. 6.) The expected testimony of defendant's expert, James P. McGaughy, Jr., however, will establish that the NRC license, NRC regulations and orders, submissions to the NRC, and NRC inspection reports are not considered

documents "related" related to a power supply contract based on his knowledge and experience with industry practice. Moreover, even assuming that the NRC license, NRC regulations and orders, submissions to the NRC, and NRC inspection reports are considered "related" documents, it will be clear at trial that none of these documents contain the requisite specifications and amount of the property for which plaintiff seeks ITC.

**CONTENTIONS OF LAW**

**A. Statutory background**

The investment tax credit was enacted in 1962 to stimulate economic growth and spur the expansion and modernization of the nation's productive facilities. *See generally* Robert E. Rosacker & Richard W. Metcalf, *United States Federal Tax Policy Surrounding the Investment Tax Credit: A Review of Legislative Intent and Empirical Research Findings over Thirty Years* (1962-1991), 9 Akron Tax J. 59 (1992). Prior to its repeal in 1986, the investment tax credit had an on-again, off-again history. It was suspended in 1966, reinstated in 1967, repealed in 1969, and restored in 1971.[2] In general, under the investment tax credit, a taxpayer that acquired certain machinery and equipment for use in its trade or business was allowed a credit against its income tax liability in an amount of up to ten percent of its investment in qualified property placed in service. §§ 38, 46.

The Tax Reform Act of 1986 (the Act), Pub. L. No. 99-514, 100 Stat. 2166, reduced the top marginal tax rates paid by individuals and corporations and eliminated various tax preferences. James S. Eustice et al., *The Tax Reform Act of 1986: Analysis and Commentary* p.

---

[2] See Act of November 8, 1966, Pub. L. No. 89-800, § 1(a), 80 Stat. 1508; Act of June 13, 1967, Pub. L. No. 90-26, 81 Stat. 57; Tax Reform Act of 1969, Pub. L. No. 91-172, § 703(a), 83 Stat. 487, 660; Revenue Act of 1971, Pub. L. No. 92-178, § 101(a), 85 Stat. 497, 498.

1-7 n. 26 (1987); *see also* Edward Yorio, *Equity, Efficiency, and the Tax Reform Act of 1986*, 55 Fordham L. Rev. 395, 434 (1987) ("To compensate for the losses in revenue caused . . . by corporate rate reduction, the 1986 Act repeals (or restricts) a host of exclusions, deductions, and credits primarily used by corporate taxpayers."). The Act repealed the investment tax credit for property placed in service after 1985. § 49(a).

Congress recognized that repeal of the credit might create a hardship for some companies that had relied on the old law. Therefore, Congress created a number of transition rules to provide relief, over a five-year period, to taxpayers who were in various stages of acquisition or construction of property otherwise qualifying for the credit but that would not be placed into service until after 1985. *United States v. Kjellstrom*, 916 F.Supp. 902, 905 (W.D. Wisc. 1996), *aff'd*, 100 F.3d 482 (7th Cir. 1996); see § 49(b)(1).[3]

Section 203 of the Act contains the general transitional rule--the "binding contract" rule--which, in pertinent part, provides:

> (b) General Transitional Rule.--
>
> (1) In General.-- The amendments made by section 201 shall not apply to--
>
> (A) any property which is constructed, reconstructed, or acquired by the taxpayer pursuant to a written contract which was binding on [December 31, 1985].

---

[3] Transition property is "any property placed in service after December 31, 1985," which would otherwise not be entitled to investment tax credit. § 49(e). In order to qualify as "transition property," the property must satisfy one or more of the transition rules and be placed in service by specified dates. The definition of "transition property" for investment tax credit purposes relies on the transition rules applicable to the accelerated cost recovery system (ACRS), but with earlier effective dates. Section 201 of the Act contains amendments to the accelerated cost recovery system (ACRS) of depreciation. See § 168.

Under the "binding contract" rule, the construction or acquisition of the property must be the subject matter of the contract. H.R. Conf. Rep. No. 99-841 at II-55 (1986), reprinted in 1986-3 C.B. (vol. 4) 1, 55 (hereafter "Conf. Rep."). The binding contract rule has a specificity requirement, *i.e.*, it does not apply to contracts that "fail to specify the amount or design specifications of property to be purchased; such contracts are not to be treated as binding contracts until purchase orders are actually placed." Conf. Rep. at II-55 to II 56.

The binding contract rule (§ 203(b)(1)(A)) is relevant here because the supply or service contract transition rule, § 204(a)(3))--upon which Connecticut Yankee relies--is a corollary of the binding contract rule. The supply or service contract rule is set forth in § 204(a)(3) of the Tax Reform Act of 1986, which provides as follows:

> (a) Other transitional rules.--
>
> (3) Supply or service contracts.--The amendments made by section 201 shall not apply to any property which is readily identifiable with and necessary to carry out a written supply or service contract, or agreement to lease, which was binding on [December 31, 1985].

Unlike the binding contract transition rule, the supply or service transitional rule applied to contracts not between the taxpayer and the party that would deliver the property, but instead to contracts between the taxpayer and the person to whom the taxpayer would provide supplies or services. Conf. Rep. at II-59. The supply or service contract rule, as a corollary to the binding contract rule, "must satisfy the requirements of a binding contract [specifying the amount or design specifications of property to be purchased]." *Id*. at II-60.

The supply or service contract rule, like the binding contract rule, has a specificity requirement. The statute itself, of course, requires that the property be "readily identifiable with and necessary to carry out a supply or service contract." The Conference Report elaborates on

this requirement, and states that the "transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents." Conf. Rep. at II-60. The parameters of the specificity requirement is at the center of the parties' dispute.

**B. The transition rules of the Tax Reform Act of 1986, as special exemptions from tax, are to be narrowly construed**

The issue here is the interpretation of Section 204(a)(3), which requires that property be "readily identifiable with and necessary to carry out a written supply or service contract."[4] In general, courts look to the plain meaning of a statute. *Reves v. Ernst & Young*, 507 U.S. 170, 177 (1993); *Bath Iron Works v. Dir. Office of Workers' Comp.*, 136 F.3d 34, 37 (1st Cir. 1998). In construing a statute, the courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use. *Reves*, 507 U.S. at 177-79; *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 697-98 (1st Cir.), *cert. denied*, 513 U.S. 919 (1994). To determine that meaning, courts are obliged to read the statute as a whole, *Bath Iron Works*, 136 F.3d at 44, and give effect to every word Congress used so that no part will be rendered inoperative or superfluous. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). If the statute is ambiguous, it is appropriate to look to its legislative history. *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d at 698.

Section 204(a)(3) is a special exemption from the general repeal of the investment tax credit. It is well established that "provisions granting special tax exemptions are to be strictly

---

[4] Section 204(a)(3) is but one of many transition rules meant to supplement the general, binding contract rule. Sections 204(a)(5) through (a)(33) of the Act contain a series of narrow transition rules generally designed to provide relief for a specific taxpayer. Among those rules are at least eight directed towards specific taxpayers with power-generating facilities.

construed." *Helvering v. Northwest Steel Rolling Mills*, 311 U.S. 46, 49 (1940); *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985); *Estate of Bell v. Commissioner*, 928 F.2d 901, 903 (9th Cir. 1991). This is equally true when the statute in question is a tax transition rule of the type at issue here. *Kjellstrom*, 916 F.Supp. at 905 ("transition rules offering tax credits are to be construed strictly"); *Apache Bend Apts., Ltd. v. United States*, 987 F.2d 1174, 1175 (5th Cir. 1993) (*en banc*) (special transition rules of Tax Reform Act of 1986 described as providing "specified exemptions from designated provisions of the [Tax Reform Act of 1986] to a very, very few specified taxpayers").

Indeed, the legislative history of § 204 shows that Congress intended a narrow construction of the additional transition rules included in the 1986 Act. The Conference Report ("the most persuasive evidence of congressional intent besides the statute itself," *RTC v. Gallagher*, 10 F.3d 416, 421 (7th Cir. 1993)), provides that the "special transition rules" are "of limited application." Conf. Rep. at II-62 (discussing "other exceptions"); *see also New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934) (deductions depend on legislative grace); *Norfolk Southern Corp. v. Commissioner*, 140 F.3d 240, 244 (4th Cir.), *cert. denied*, 525 U.S. 1000 (1998) (tax credits are a matter of legislative grace, and taxpayer claiming credit must show its entitlement thereto). The courts that have addressed the application of § 204(a)(3) agree that it must be strictly construed. *United States v. Commonwealth Energy System*, 235 F.3d 11 (1st Cir. 2000); *FLP v. Commissioner*, 90 T.C.M. (CCH) 202 (2005); *Maine Yankee Atomic Power Co. v. Commissioner*, 84 T.C.M. (CCH) 73 (2002).

Both the binding contract and supply or service contract transition rules require that property must be identified with specificity if it is to qualify for the investment tax credit. The

Conference Report accompanying the "binding contract" transition rule confirms this (Conf. Rep. at II-55 to II-56)(emphasis added):

> The conferees also wish to clarify that the general binding contract rule does not apply to supply agreements with manufacturers, *where such contracts fail to specify the amount or design specifications of property to be purchased*; such contracts are not to be treated as binding contracts until purchase orders are actually placed.

The Conference Report regarding the supply or service contract transition rule is to the same effect (*id*. at II-60)(emphasis added):

> This transitional rule *is applicable only where the specifications and amount of property are readily ascertainable from the terms of the contract, or from related documents*. A supply or service contract or agreement to lease must satisfy the requirements of a binding contract (discussed above).

Accordingly, there is no question that Congress intended to limit transitional relief from the repeal of the investment tax credit to situations in which the specifications and amount of each item of property placed in service was readily described and identifiable.

**C. The property at issue was not "readily identifiable with" Connecticut Yankee's power supply contract or related documents**.

To qualify under the transition rule, the property for which plaintiff seeks ITC must be "readily identifiable with and necessary to carry out a written supply or service contract." § 204(a)(3). This statute must be interpreted in accordance with its plain meaning, according to "its common sense." *Kjellstrom*, 100 F.3d at 484-85 (7th Cir. 1996) (interpreting the "world headquarters" transition rule of § 204(a)(7)). "Readily" means "without hesitation," "without difficulty," or "easily." Webster's New Collegiate Dictionary 954 (1981). "Identify" means "to cause to be or become identical" or "to establish the identity of." *Id*. at 563. Thus, the phrase

"readily identifiable" means that the identity of the property can be easily determined at the time that the contract was executed.

In *Commonwealth Energy System*, 235 F.3d 11 (1st Cir. 2000), the court ruled that the phrase "readily identifiable with and necessary to carry out" means that the specifications and amount of the property must be readily ascertainable from the supply contract or related documents. The court held that the transition rule under § 204(a)(3) did not apply, because the contracts at issue did not contain the amount or specifications of potential replacement parts, and there was no contractual obligation for the taxpayer to replace parts on a specific schedule.

The property at issue here is likewise not entitled to the investment tax credit. The property Connecticut Yankee claims was placed in service in 1987 through 1990 was not "readily identifiable with and necessary to carry out" the 1964 power supply contract or any of the subsequent amendments, supplements, and additions to the 1964 contract. There simply is no term or provision in the 1964 contract or subsequent amendments, supplements, and additions that required Connecticut Yankee to replace fuel or install any particular piece of property or equipment in 1987 through 1990. Rather, the contract provides broadly that the plant would supply its electrical output to the contracting utilities. In 1964, none of the parties to the contract could have predicted which, if any, portions of the plant might need repairs or improvements twenty-five years later, nor exactly when the nuclear fuel would need to be replaced. It is not surprising, therefore, that the 1964 contract did not specifically describe this property for which Connecticut Yankee now seeks credit. Even the subsequent amendments and supplements to the 1964 contract, the last of which was executed in 1984, did not specify any of the property for

which plaintiff seeks ITC for 1987 through 1990. Thus, the power contract does not satisfy the readily identifiable requirement of § 204(a)(3).

Plaintiff argues, however, that because the power supply contract requires it to operate and maintain the plant "in accordance with good utility practice under the circumstances and all applicable law," that its NRC license and filings with the NRC constitute "related documents" which set forth the specifications and amount of the nuclear fuel and property additions. (Pl. Br. 8.) But the need to operate in accordance with the law and good utility practice is not the test under the transition rule. As explained above, the test is whether *the specifications and amount of property are readily ascertainable from the terms of the contract, or from related documents*. (Conf. Rep. At II-60.) There is no dispute that Connecticut Yankee was obligated by the power supply contract to operate and maintain the plant properly, and we do not doubt that Connecticut Yankee acted in accordance with "good utility practice" when it refueled and made the repairs and improvements. While Connecticut Yankee was required to operate and maintain the plant, the 1964 contract certainly did not specify the property to be placed in service a quarter of a century later. Neither did any of the subsequent amendments, supplements, or additions to that contract.

Moreover, many of the documents plaintiff relies on as "related documents" did not exist at the time the power supply contract or any of the amendments and supplements were executed, and thus could not satisfy the readily identifiable requirement. The Tax Court recently addressed this issue in *FLP v. Commissioner*, 90 T.C.M. (CCH) 202 (2005). While the Tax Court ultimately found that the tariff at issue there did not constitute a supply contract, the court conducted a detailed analysis of whether the property at issue was readily identifiable from the

tariff or related documents.[5] The Tax Court found that "for the documents to qualify as 'related documents', the supply contract must adequately incorporate the documents by reference." *Id.* at 228.

None of the documents plaintiff relies upon here were incorporated by reference in the power supply or its amendments, supplements, and additions. Moreover, the Tax Court effectively addressed and rejected the "industry standards" test plaintiff relies on. The Tax Court determined that "[l]anguage within a contract that generally refers to industry standards and the applicable law, without referring to a document, fails to incorporate by reference those documents created according to the industry standards and applicable laws." *Id.* at 225. Thus, plaintiff's claim that its NRC license and filings with the NRC constitute related documents fails since the power supply contract and its amendments, supplements, and additions, fail to specifically refer to any of the documents upon which plaintiff relies.

Similarly, in *Maine Yankee Atomic Power Co. v. Commissioner,* 84 T.C.M. (CCH) 73 (2002), the Tax Court considered Maine Yankee's argument that nuclear fuel assemblies were eligible for ITC on the basis that the operating license and submissions to the NRC were related documents to the power contracts at issue. *Id.* at 75. The Tax Court concluded that the operating license and submissions to the NRC were not related documents to the power contracts, because they were not incorporated by reference into the power contracts and were not prepared contemporaneously with the power contracts. *Id.* at 76. The documents upon which

---

[5] Plaintiff (Pl. Br. 10) unceremoniously dismisses the Tax Court's comprehensive examination of the supply contract issue as "dicta." While a Tax Court decision is not binding on this Court in any event, the Tax Court's thorough analysis of the issue cannot be dismissed so cavalierly.

Connecticut Yankee relies are similarly defective as they are not incorporated by reference into the power contract and were not prepared contemporaneously with the power contract.

Plaintiff argues that the Tax Court applied the wrong test and that any document "related" to the contract passes muster. (Pl. Br. 10.) Thus, plaintiff's expansive definition of "related" would write out the specificity requirement of the transition rule and place no limit on the documents that would be related to the power contract. All that would be needed, in plaintiff's view, would be any marginal connection with the operation or maintenance of the plant.

This all-inclusive interpretation was rejected by the *FLP* court based on the nature of the statute at issue here. The Tax Court held that because the ITC supply contract transitional rule grants a special tax exemption, it must be strictly construed. Accordingly, the court determined that a definition of "related" documents that would include documents that were not referred to in the supply contract is at odds with a narrow interpretation accorded to a special tax exemption and would expand the supply or service contract rule beyond its proper scope.

This conclusion is confirmed by *United States v. Zeigler Coal Holding Co.*, 934 F.Supp. 292 (S.D. Ill. 1996). In that case, the taxpayer entered into six coal supply contracts with customers. At issue was whether the property placed into service was "readily identifiable" with those contracts. The court held that "in order for the property claimed by [taxpayer] to be eligible for the ITC under § 204(a)(3), the property must be 'readily identifiable' with the supply contracts, and 'the specifications and amount of the property' must be 'readily ascertainable from the terms of the contract, or related documents.'" *Id*. at 294. In giving directions for the resolution of the case, the court rejected the idea that a contract could implicitly require the

acquisition of property: "The Court acknowledges the validity of [the Government's] argument that to allow a supply contract to implicitly require the acquisition of property, means that the transition rule exception would swallow the rule eliminating the ITC."[6] *Id*. at 295.

While plaintiff argues that *Maine Yankee* is factually distinguishable, an examination of the relevant documents indicates otherwise. Plaintiff correctly states that the *Maine Yankee* court "ruled that the operating license and amendments and appendices thereto were not 'related documents' to the power contracts, because they were not 'incorporate[d]' into the power contracts and were not prepare 'contemporaneously' with the power contracts." (Pl. Br. 9-10.) Plaintiff argues that *Maine Yankee* is inapposite because "[i]n Connecticut Yankee's case, as indicated above, the NRC regulations asserted to be related documents to the power contract **were incorporated** into the power contract, and the power contract expressly required compliance with the operating license as amended." (Emphasis added, Pl. Br. 10.) Plaintiff points to the language in the power contract that "expressly requires operation of the plant 'in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954 and of any license issued thereunder.'" (Pl. Br. 8.) On that basis, plaintiff concludes that the "NRC license - together with any filings by Connecticut Yankee with NRC required under the license - were accordingly 'related documents.'" (Ibid.) In *Maine Yankee*, however, the power contract at issue contained almost identical language to the Connecticut Yankee power contract: "Maine Yankee will operate and maintain the Unit in accordance with good utility practice under the circumstances

[6] The court denied the Government's motion for summary judgment only because "at least some of the property [was] readily ascertainable from the contracts." *Ibid.*

and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954, as amended, and of any licenses issued thereunder to Maine Yankee." *Maine Yankee*, at 74. It is impossible to distinguish any meaningful difference between the provisions of the *Maine Yankee* and Connecticut Yankee power contracts, so plaintiff's argument that *Maine Yankee* is inapposite is simply groundless. In any event, such NRC documents do not contain the requisite the specifications and amount of the property for which plaintiff seeks credit.

Another case that addressed the question of related documents is *Bell Atl. Corp. v. United States*, 224 F.3d 220 (3rd Cir. 2000). The taxpayer in that case claimed ITC for major improvements to its telephone systems. The court examined whether any of the property improvements were readily identifiable with and necessary to carry out the contracts at issue. The court found that the property for which the taxpayer sought ITC could not be determined from the terms of any of the contracts, because "they only spoke of service quality standards, never mentioning property of any sort." *Id*. at 224. The taxpayer, however, asserted that its estimate files were related documents, because the estimate files documented the purchase of and need for the new property under the service quality standard. The court held "that property cannot be shown to be 'readily identifiable with' a written service contract by means of internally generated documents, such as the estimate files * * *, that were not prepared contemporaneously with the contract, that had no binding effect on anyone, and that were not provided to the other contracting party." *Id*. at 225.

**D. Plaintiff cannot substantiate the specifications and amount of property for which ITC is sought**

Plaintiff must substantiate its claim for ITC with evidence sufficient to satisfy the requirements of §204(a)(3) with respect to the specifications and amount of property for which ITC is sought. *See Sartin v. United States*, 5 Cl. Ct. at 177; *L.W. Hardy v. United States*, 1 Cl. Ct. at 465-66, 471. The consequence of the lack of evidence on a material element of ITC claimed is that plaintiff's claim must be rejected. *Sartin*, at 177 (citing *Burnet v. Houston*, 283 U.S. 223, 228, (1931)).

In general, there must be direct documentary evidence to satisfy the ITC requirements and absent such evidence, testimony alone is unpersuasive. For example, in *Sartin*, 5 Cl. Ct. at 178, a general ledger, without a cash receipts and disbursement journal, paid or unpaid bill files to trace the monthly postings, and some check stubs were found insufficient to support a claim for ITC when a taxpayer should have kept a daily record. In *Rosenberg v. United States*, 3 Cl. Ct. 432, 437 (1983), plaintiff's valuation of property based solely on his imperfect, personal recollection was found insufficient. In *L.W. Hardy*, 1 Cl .Ct. at 470-71, estimates based on what an accountant believed was reasonable and not based on supporting contemporaneous records were found unreliable. Moreover, testimony based on documents which allegedly once existed, but which were subsequently lost or destroyed, is insufficient to establish a taxpayer's claim. *Liddy v. Commissioner*, 808 F.2d 312, 315 (4th 1986), *reh'g denied*, 815 F.2d 1007 (4th Cir.1987); *see also Jupiter Corp. v. United States*, 2 Cl. Ct. 58, 71 (1983). Similarly, summary appraisals based on non-contemporaneous records, or data reconstructed from accidently lost or destroyed documents, are unpersuasive. *See Jupiter*, 2 Cl. Ct. at 71. Nor can taxpayer's estimate

assumptions, based on guesses without supporting records, support a claim for ITC. *L.W. Hardy*, 1 Cl. Ct. at 470-71.

Thus, even assuming that any of the documents cited by plaintiff constitute documents "related" to the power contract, plaintiff cannot satisfy the specificity and amount requirement of § 204(a)(3). As the Conference Report described this requirement, the "transitional rule is applicable only where the specifications and amount of the property are readily ascertainable from the terms of the contract, or from related documents." The evidence at trial will show that none of the documents put forth by plaintiff contain the requisite specifications and amount of property. At most, the documents contain only general descriptions of property or capital projects and do not have any detailed specifications or information about the specific amount of property for which plaintiff seeks ITC. From the documents plaintiff has identified as exhibits, Connecticut Yankee apparently is claiming that it may prove its case merely by alleging that (1) at some point in time, regardless of when the power contract or its amendments or additions were executed, it was required by "good utility practice" or NRC requirements to acquire or install property, (2) in the normal course of business the property in question would have reasonably required the preparation of acquisition plans or designs, and therefore, (3) plans or designs which contained the specifications and the amount of property must have existed–all without producing any evidence to support those allegations. The supply contract rule is not so lax, however, and, it requires that the property be readily ascertainable from the power contract or related documents. It is not enough to allege the existence of documents--they must be produced. If production of the documents from which the property is readily ascertainable were

not required, the transition rule would be without substance. Since plaintiff has failed to produce any such documents, plaintiff cannot substantiate its claim for ITC.

**E. Connecticut Yankee's reliance on a senatorial colloquy to support its broad interpretation is misplaced**

While giving lip service to the specifications and amount requirement set forth in the Conference Report, plaintiff actually seeks to negate those requirements. Plaintiff argues that a June 24, 1986, colloquy between Senators Long, Packwood, and Matsunaga, defines the specifications and amount requirement.

But if it is appropriate to examine the legislative history of a statutory provision at all, there is a general hierarchy assigned to legislative materials. At one end of the spectrum is a conference report, which is considered "especially persuasive evidence of congressional intent [because it] represents the final word on the final version of a statute." *Planned Parenthood Fed'n v. Heckler*, 712 F.2d 650, 657 n.36 (D.C. Cir. 1983); *see also Public Citizen v. Department of Justice*, 491 U.S. 440, 475 (1989) (Kennedy, J., concurring) (the text of the conference committee report is "the most obvious place" for finding statement of congressional findings). Similarly, committee reports are considered reliable and persuasive elements of legislative history. *Thornburg v. Gingles*, 478 U.S. 30, 44 n.7 (1986).

Congressional colloquies, in contrast, lie towards the other end of the spectrum. A colloquy is a discussion between members of Congress and managers of a bill, usually a committee chairman, regarding pending legislation. Colloquies generally arise in tax statutes when a taxpayer asks a member to insert a colloquy into the record of debate about an item of importance to that taxpayer. See 1 Jacob Mertens, Jr., *The Law of Federal Income Taxation* § 3:21 (1999). If the committee chairman agrees to the colloquy, it is drafted by the member's

staff and inserted into the Congressional Record. *Id*. Some colloquies are accorded more weight than others. For example, colloquies carry the greatest weight if similar ones take place in both the House and Senate. *Id.* But if a colloquy takes place in only one chamber, it may be considered more persuasive if it takes place in the chamber where the bill originated. *Id*.

To give weight to colloquies over the language of the statute "would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d at 699 (quoting *Regan v. Wald*, 468 U.S. 222, 237 (1984).) The language of the report of a joint conference committee of both Houses of Congress is accorded a good deal more weight than the remarks even of the sponsor of a particular portion of a bill on the floor of the chamber. *Chandler v. Roudebush*, 425 U.S. 840, 858 n. 36 (1976); *United States v. Automobile Workers*, 352 U.S. 567, 585-586 (1957).

Moreover, the use of colloquies during the enactment of the Tax Reform Act of 1986 was the subject of some controversy. At the time of final passage of the reform act, Ways and Means Committee Chairman Rostenkowski sounded a warning about the use of colloquies in interpreting the act (132 Cong. Rec. 26,206 (Sept. 25, 1986)):

> As chairman of the Committee on Ways and Means, I am often asked to participate in colloquies with other Members . . . regarding the . . . effect of specific provisions in tax legislation. I take the responsibility to implement the decisions of the Committee on Ways and Means, and in this instance, the conference committee, very seriously. Consequently, I have limited the colloquies that I have agreed to participate in to those which do not attempt to modify the substantive agreement reached by the conferees on H.R. 3838. In addition, because we are discussing a conference agreement rather than a bill of merely one House of the Congress, for a colloquy to be considered as reflective of the conference agreement, it should have been

> discussed in a substantially similar manner in both the House and the Senate. Otherwise, the views expressed can be considered only the views of one House and not necessarily reflective of the decisions made by the conferees.

After Chairman Rostenkowski made this statement, the Senate engaged in approximately twenty-nine colloquies, none of which specifically addressed the June 24, 1986, colloquy plaintiff cites. 132 Cong. Rec. 26,678 - 26,687 (Sept. 27, 1986); Jack Teuber, *Colloquies: What They Are and What They Do*, 33 Tax Notes 128 (Oct. 13, 1986) (hereafter "*Colloquies*").

Since the Conference Report is explicit that the specifications and amount of property be described in the contract or related documents, the colloquy plaintiff cites should be accorded little, if any, weight. In addition, the colloquy plaintiff relies on took place only in the Senate; there was no similar colloquy in the House. As Chairman Rostenkowski noted, a colloquy regarding the Tax Reform Act of 1986 is not authoritative unless it took place in both chambers. *See also Department of Air Force v. Rose*, 425 U.S. 352, 366 (1976) ("The basic principle is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one.") (quoting K. Davis, *Administrative Law Treatise* § 3A.31, p. 175 (1970 Supp.)) Moreover, the timing of the colloquy in this instance is important. The colloquy took place in June 1986, before the bill was even sent to conference.

In addition to these fundamental problems of using the "boot-strapped legislative history" of a colloquy,[7] the colloquy itself does not appear to be relevant to the facts in this case. Plaintiff

---

[7] *See Tax Reform Act of 1986: Analysis and Commentary*. In his commentary, Professor Eustice expressed some skepticism regarding the use of colloquies (*The Tax Reform Act of 1986* at 1-26):

> Moreover, legislators' inability to get a particular pet provision into the statute or the relevant Committee reports led in

(continued...)

fails to consider that Senator Matsunaga's first question regarding the application of the supply or service contract transition rule to power sales contracts was whether the rule "would cover a taxpayer who entered into a written binding power sales contract by the qualification date and is required to construct or have constructed facilities that will produce the power necessary to fulfill this contractual obligation?" 132 Cong. Rec. 15,028. Only after receiving a "yes" answer to this question did he turn to the point, relied upon by plaintiff, that all that the contract had to do was identify the type of generating equipment and specify the amount of generating capacity required by the plant. Indeed, the situation set out in the colloquy was one in which, on the effective date of the repeal of the investment tax credit, December 31, 1985, the utility was in the process of building a power plant, or about to begin to do so. It was not the situation, as here, where the taxpayer built the plant some twenty-five years earlier and subsequently (after the investment tax credit had been repealed) installed a piece of equipment or replaced fuel. No mention or suggestion is made in that colloquy that the Senators meant to include replacement fuel, parts, or improvements made to every power plant that had an electric supply contract then in force. In short, the circumstances discussed in the colloquy are starkly different than those plaintiff presents to this Court. Plaintiff's reliance on the colloquy is misguided.

*Commonwealth Energy System*, 235 F.3d at 16.

---

[7](...continued)

> some instances to a full flowering of the floor "colloquy" as a means of creating some boot-strapped legislative history. Although probably of dubious persuasiveness, the technique of floor colloquy (and the occasional counter-colloquy) demonstrates conclusively that a good lobbyist never quits as long as the Congressional Record is open for business.

**F. Connecticut Yankee's alleged reliance interest will not be defeated by disallowance of the credit**

Plaintiff asserts that prior to 1986, it had developed a strong reliance on the existence of ITC. First, there is no evidence that Connecticut Yankee, when it originally negotiated its 1964 contract, was relying on the availability of the investment tax credit twenty-five years later when refueling and improvements to the plant may have been needed. The power contract set forth a formula for the price of electricity, and that formula specifically allowed Connecticut Yankee to recoup its costs, irrespective of the availability of ITC. Nor is there any evidence that reliance on ITC played any part in the subsequent amendments or additions to the original power contract. In any event, a reliance interest is not the test under the ITC transition rule. As previously explained, the test is whether the specifications and amount of property are readily ascertainable from the terms of the contract, or from related documents. Moreover, the fact that none of the property at issue was readily identifiable at the time the power contract or its amendments, supplements, and additions were executed makes it more likely that plaintiff did not rely on claiming the investment tax credit. *See Commonwealth Energy System*, 235 F.3d at 17.

**G. ITC is not allowable under the transitional rule for plaintiff's nuclear fuel and other property additions because they have a class life of less than seven years**.

The "transition property" exception to the repeal of the investment tax credit is not open-ended. Rather, property must be placed in service by certain outside dates to qualify as transition property, depending on the class life of the property. As explained in more detail below, the transitional rules provide that property with a life of less than five years must be placed in service by July 1, 1986, property with a life of five to seven years must be placed in service by

January 1, 1987, property with a life of seven to 20 years must be placed in service by January 1, 1989, and for property with a life of more than 20 years must be placed in service by January 1, 1991. Here, the property for which plaintiff claims investment tax credits does not qualify as "transition property" because it was not placed in service by the applicable dates. For example, the replacement nuclear fuel has a class life of six years and therefore had to be placed in service by January 1, 1987, to qualify as transition property. Plaintiff did not install the fuel at issue here until 1988 and 1990, so it does not qualify as transition property.

Section 49(e)(1), as added by § 211(a) of the 1986 Act (100 Stat. at 2167), provides that "transition property" means "property placed in service after December 31, 1985," "to which the amendments made by section 201 of the Tax Reform Act of 1986 do not apply," but that, "in making that determination," several special rules apply, one of which is as follows (§ 49(e)(1)(C)):

> (C) in the case of transition property with a class life of less than 7 years--
>
> > (i) section 203(b)(2) of such Act shall apply, and
> >
> > (ii) in the case of property with a class life--
> >
> > > (I) of less than 5 years, the applicable date shall be July 1, 1986, and
> > >
> > > (II) at least 5 years, but less than 7 years, the applicable date shall be January 1, 1987, . . . .

Relevant to this case, §§ 203(b)(1) and (2)(A) provide, in relevant part:

> (b) <u>General Transitional Rule</u>.--
>
> > (1) <u>In General</u>.--The amendments made by section 201 shall not apply to--
> >
> > (2) <u>Requirement that certain property be placed in service before certain date</u>.--

(A) In General.--Paragraph (1) and section 204(a) (other than paragraph (8) or (12) thereof) shall not apply to any property unless such property has a class life of at least 7 years and is placed in service before the applicable date determined under the following table:

| In the case of property with a class life of: | The applicable date is: |
| --- | --- |
| At least 7 but less than 20 years ................................ | January 1, 1989 |
| 20 years or more ...................................................... | January 1, 1991 |

Also relevant is § 203(b)(2)(C)(ii), which provides that "property described in section 204(a) shall be treated as having a class life of 20 years," for purposes of subparagraph (A), above.

Thus, eligible property had to be placed in service by one of four applicable dates to qualify as "transition property." This statutory scheme was explained in the legislative history to the 1986 Act as follows:

For purposes of the investment tax credit transitional rules, the applicable placed-in-service dates are: (1) for property with an ADR midpoint less than five years, July 1, 1986, (2) for property with an ADR midpoint of at least five but less than seven years . . . January 1, 1987, (3) for property with an ADR midpoint of at least seven but less than 20 years . . . January 1, 1989 and (4) for property with an ADR midpoint of 20 years or more, January 1, 1991.

H.R. Conf. Rep. No. 99-841 at II-54. In other words, as the conference report reflects, the modifications to § 203(b)(2) made by § 49(e)(1), effectively created a new placed-in-service table that reads as follows:

| In the case of property with a class life of: | The applicable date is: |
| --- | --- |
| Less than 5 years .......................................... | July 1, 1986 |
| At least 5 but less than 7 years ....................... | January 1, 1987 |
| At least 7 but less than 20 years .................... | January 1, 1989 |

20 years or more .......................................... January 1, 1991.

In the instant case, the nuclear fuel for which plaintiff claims ITC has a class life of less than seven years. Rev. Proc. 87-56, 1987-2 C.B. 674, 676. Because the nuclear fuel had a class life of only 6 years, it had to be placed in service before January 1, 1987 to be eligible for transitional ITC. *See Airborne Freight Corp. v. United States*, 153 F.3d 967, 971-972 (9th Cir. 1998), *cert. denied*, 526 U.S. 1112 (1999); *Kjellstrom*, 916 F.Supp. at 908-909. The nuclear fuel for which plaintiff seeks ITC was not placed in service until 1988 and 1990. Accordingly, it was not placed in service within the periods allowed by the transition rule.

Plaintiff argues that, under Section 203(b)(2)(C), <u>all</u> property it placed in service must be treated as if it has a class life of 20 years, with the result that the applicable placed-in-service date would be January 1, 1991. Plaintiff's assertion is incorrect. Plaintiff points to the language of § 203(b)(2)(C)(ii), which provides that, for purposes of § 203(b)(2)(A), "property described in section 204(a) shall be treated as having a class life of 20 years." Plaintiff claims this provision means that property described in § 204(a) shall be treated as having a class life of 20 years for <u>all</u> purposes rather than just for purposes of § 203(b)(2)(A). But § 203(b)(2)(C)(ii) does not so state. "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (quotation omitted); *see also Beecham v. United States*, 511 U.S. 368 (1994) ("[t]he plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences"); *Smith v. United States*, 508 U.S. 223 (1993) (quotation omitted) ("[s]tatutory construction . . . is a holistic endeavor").

It is apparent from the foregoing statutory scheme that Congress intended by the enactment of Section 49(e) to incorporate the transitional rule of § 203(b), but also to impose different "applicable date[s]" (§ 49(e)(1)(C)(ii)) by which property had to be placed in service than were provided in § 203(b)(2). The provision in § 49(e)(1)(C)(ii) for different "applicable date[s]" than are contained in § 203(b)(2) confirms this. Since there is no other provision within § 49 that refers to "applicable date[s]," or makes any use of the "applicable dates" set forth in § 49(e)(1)(C)(ii), the applicable dates set forth therein would serve no purpose unless those applicable dates were to be used in place of the applicable dates set forth in § 203(b)(2) in the case of property otherwise having a class life of less than seven years. *See Kjellstrom*, 916 F.Supp. at 909.

Accordingly, from both the language and context of § 203(b)(2)(C)(ii), it is apparent that the provision applies only for the limited purpose of applying the table in § 203(b)(2)(A). The interpretation advanced by plaintiff would read out of the statute the language in § 203(b)(2)(A), which provides, in relevant part, that "section 204(a) . . . shall not apply to any property unless such property has a class life of at least 7 years." (Emphasis added.) Under plaintiff's interpretation, all property described in § 204(a) must be treated as having a class life of 20 years, thus rendering the reference in § 203(b)(2)(A) to § 204(a) property having a class life "of at least 7 years" meaningless. Further, § 49(e)(1)(C), which makes § 203(b)(2) applicable in the first place, explicitly applies only to "transition property with a class life of less than 7 years." (Emphasis added.) Under plaintiff's interpretation, this language as well would be rendered nugatory. But it is axiomatic that a statute should be construed so as to give meaning to every word in the statute.

In *Airborne Freight Corp.*, 153 F.3d at 971-972, the court held that the appropriate reading of § 203(b)(2)(C) is "to consider it as 'treating' § 204(a) property (which must have a class life of 7 years or more) as having a 20-year life for the purpose of the applicable date by which it must be placed in service-January 1, 1991." While, the court recognized that its interpretation could negate the provision of § 203(b)(2)(A) with regard to such property with a life of at least 7 but less than 20 years, it concluded that the district court's reading (which is consistent with plaintiff's interpretation) would do even more violence to § 203(b)(2)(A) because it would negate virtually all of subsection (A), not just 7 to 20-year property.

Thus, the proper interpretation of § 203(b)(2)(C)(ii) and § 49(e) is that property described in § 204(a), but which otherwise has a class life of at least seven years, shall be treated as having a class life of 20 years for purposes of the table in § 203(b)(2). This results in an applicable placed-in-service date of January 1, 1991, for such seven-plus-year property. For property that otherwise has a class life of less than seven years, however, the dates set forth in the table in § 203(b)(2) do not govern. Instead, the dates by which such property must be placed in service are the "applicable date[s]" set forth in § 49(e)(1)(C). *Airborne Freight Corp.*, 153 F.3d at 971-972; *Kjellstrom*, 916 F.Supp. at 908-909; see § 49(e)(1)(C)(ii); H.R. Conf. Rep. No. 99-841.

Since plaintiff's nuclear fuel and some other property additions did not have a class life of at least seven years, the relevant placed-in-service date under Section 49(e)(1)(C) for such property was no later than January 1, 1987. Since the fuel and property additions at issue were not place in service by the applicable dates, such property is not transition property and, thus, does not qualify for transitional investment tax credit.

## CONCLUSION

Based on the foregoing, the United States submits that at trial plaintiff will not be able to establish that it is entitled to transitional ITC for the property plaintiff claims was placed in service in the 1987-1990 tax years. Accordingly, because plaintiff bears the burden of proof in this case, the Court must dismiss the complaint with prejudice.

Respectfully submitted,

February 28, 2006
Date

s/G. Robson Stewart

G. ROBSON STEWART
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6493

EILEEN J. O'CONNOR
Assistant Attorney General
DAVID GUSTAFSON
Acting Chief, Court of Federal Claims Section
STEVEN I. FRAHM
Assistant Chief

February 28, 2006
Date

s/Steven I. Frahm
Of Counsel